UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
MATTHEW ISAAC FELDER,

               Plaintiff,

                                         COMPLAINT

       - against -                     PLAINTIFF DEMANDS
                                     <u>A TRIAL BY JURY</u>

WARNER BROS. DISCOVERY, INC.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Plaintiff Matthew Isaac Felder ("Felder" or "plaintiff"), by his attorneys, Vladeck, Raskin & Clark, P.C., complains of defendant Warner Bros. Discovery, Inc. ("WBD," the "Company," or "defendant") as follows:

<u>NATURE OF THE ACTION</u>

1.     Felder is an accomplished sales professional with nearly 20 years of experience in the industry and was a dedicated employee of WBD and its predecessors for most of his professional career. Throughout his tenure at the Company, Felder, who consistently received excellent performance reviews, was a tireless worker; a highly regarded team member and manager; and a superlative performer who earned the respect of his colleagues, direct reports, and managers.

2.     WBD, however, took away Felder's hard-earned career and reputation when it decided it needed a scapegoat to deflect scrutiny for its failure to promptly address sexual harassment. A male employee of WBD, "M.S.", sexually harassed a female representative of a client company ("the client"). Although Felder was, on information and belief, the only

individual from WBD who both reported and tried to stop the sexual harassment, WBD punished him more harshly than employees who stood by and did nothing.

3.  After reporting the harassment, Felder fully cooperated with WBD's investigation, which the Company assured him was not targeting him or his conduct. WBD's investigator thanked Felder for coming forward and several others, including WBD clients, expressed gratitude for his handling of the incident. Due to these assurances, Felder was shocked when, having never received any criticism about how he had handled the situation, WBD summarily fired him, purportedly for "cause." The decision was based on the false premise that Felder was the "senior leader" at the event where the harassment took place, even though he was not, and thus had a "duty to ensure" that other employees complied with WBD policies, which he did to the best of his ability.

4.  WBD's decision to fire Felder was unlawful retaliation for his protected report of sexual harassment against another WBD employee, for his complaint that WBD was not taking sufficient disciplinary action, and for his participation in the Company's internal sexual harassment investigation. After Felder complained of retaliation, both directly and through his attorney, WBD went into damage control mode and changed its stated reasons for firing him, belatedly claiming, inter alia, that Felder should have effectively acted as a bouncer or security guard and physically removed the WBD employee who engaged in sexual harassment and over whom Felder had no supervisory authority, from a Company event.

5.  WBD's retaliatory animus is particularly evident in its application of different standards to Felder compared to other employees. On information and belief, Felder was the only individual (other than M.S., the employee who committed the underlying misconduct) who was fired from the Company in connection with the event. Other employees involved with the

2

event kept their jobs, including those who, unlike Felder: planned the event; purchased alcohol for the event; approved the event; failed to intervene and mitigate the situation; and failed to report the misconduct at the event. Furthermore, while WBD asserts that it found other employees had also breached its Code of Ethics and Alcohol Policy, on information and belief, it merely issued those employees written warnings. Also, on information and belief, WBD has historically failed to discipline employees who, unlike Felder, actually violated Company policies and engaged in misconduct, and who had not made protected complaints.

6.      On information and belief, WBD falsely told numerous individuals that Felder was fired "for cause" because he violated his duties and/or was otherwise responsible for the improper conduct. To add insult to injury, after jettisoning Felder and damaging his reputation, WBD also refused to pay him the severance and compensation he had earned.

7.      Plaintiff brings this action to remedy retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "NYSHRL"); and the Administrative Code of the City of New York § 8-101 et seq. (the "NYCHRL").

8.      Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, reasonable attorneys' fees and costs of this action, pre- and post- judgment interest, and other appropriate relief.

## JURISDICTION AND VENUE

9.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343(a).

10.     This Court has supplemental jurisdiction over plaintiff's claims under the NYSHRL and the NYCHRL pursuant to 28 U.S.C. § 1367 because these claims closely relate to

the federal claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because WBD operates and is headquartered in New York City; because plaintiff worked for WBD in New York City; and because a substantial part of the events or omissions giving rise to the claims took place in this District.

12.    Pursuant to Section 8-502(c) of the New York City Human Rights Law, Felder will cause to be served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

13.    On December 13, 2022, Felder filed a charge against defendant alleging unlawful retaliation with the United States Equal Opportunity Employment Commission (the "EEOC"). On June 28, 2023, the EEOC issued plaintiff a notice informing him of the right to sue under Title VII.

<u>PARTIES</u>

14.    Felder worked for defendant and its predecessors from April 2004 until defendant unlawfully fired him on or about August 18, 2022.  At all relevant times, Felder worked in New York, New York.

15.    WBD is a Delaware Corporation headquartered in New York and has approximately 37,500 employees.  WBD is a media and entertainment conglomerate formed from Warner Media's merger with Discovery, Inc. in April 2022.

<u>BACKGROUND</u>

<u>Plaintiff's Career at WBD</u>

16.    Felder joined Scripps Networks as an Advertising Sales Assistant in April 2004.

4

17.     By 2006, Felder has worked his way up to the position of Account Executive, bypassing the interim position of Associate Account Executive.

18.     On information and belief, Felder's ascension from Sales Assistant to Account Executive in under three years is faster than that of any other Company employee during his tenure.

19.     Scripps Networks was acquired by Discovery in or around 2018.

20.     In or around 2021, the Company promoted Felder to Vice President ("VP") of Integrated Ad Sales.

21.     After April 2022, following the merger of AT&T's Warner Media and Discovery Inc., Felder's role expanded to include Warner Media assets as well as the Discovery assets he had been working on, although his title remained the same.

22.     As his trajectory shows, Felder was a top performer at the Company. Felder received excellent performance reviews every year. In addition, WBD awarded Felder numerous accolades, including Negotiator of the Year in 2011 and Salesperson of the Year in both 2012 and 2014.

23.     WBD also nominated Felder to participate in several leadership programs based on his stellar performance. Felder participated in official mentorship programs and informally served as a mentor to junior members of the Sales Organization at the request of senior leadership.

24.     In describing Felder to new hires who he wanted Felder to mentor, Chief U.S. Ad Sales Officer, Jon Steinlauf ("Steinlauf"), referred to Felder, in sum and substance, as a "home grown talent" and "success story."

<u>WBD Plans an Event at Gillette Stadium</u>

25.     On June 23, 2022, a WBD account executive who reported to Felder asked him for approval from the Discovery business side to purchase a suite at Gillette Stadium in Foxborough, Massachusetts for the Elton John concert on July 28, 2022.

26.     According to the account executive, several clients had reached out with an interest in attending the concert.

27.     This account executive also told Felder that another Vice President at WarnerMedia, Ryan Spicer ("Spicer"), had already approved the request.  Spicer had been a Vice President since 2014, which was far longer than Felder.

28.     After Felder consulted with his two VP counterparts Stan Soong ("Soong") and Jeff Pellegrini ("Pellegrini"), Soong, Pellegrini, and Felder sent an email from Felder's email account to their supervisors to request approval for the event.

29.     Felder, Soong, and Pellegrini were supervised by Senior Vice Presidents ("SVPs"), including Michele Kornett ("Kornett") (Felder's supervisor); Jonathan LaConti; and Robert Latorre.

30.     On June 27, 2022, Felder received email confirmation from the three SVPs that they had approval from their supervisors, who were Executive Vice Presidents ("EVPs").  This included Kornett's supervisor Greg Regis ("Regis"); Karen Grinthal; and Scott Kohn.

31.     After June 27, 2022, consistent with WBD policy, Felder was not involved in the planning of the event and did not receive any information about the planning from the employees who led that effort other than the basic information, including date, time, and accommodation information, provided to all potential attendees.

32.     The organizers invited at least 32 potential attendees, including Company

clients and WBD employees.  Among the attendees were at least eight WBD VPs or SVPs.

33.      Felder did not purchase anything for the event, such as food, alcohol, or decor, and no one requested his approval for, or otherwise discussed with him any expenses incurred for, the event.

34.      Felder was invited to the event but was not required to attend.

35.      At the time the WBD employees were planning the event, Felder did not know whether he would be available to attend, and thus secured a refundable hotel room around the time WBD confirmed its approval for the event.

36.      On information and belief, other VPs and SVPs also booked refundable rooms for the event around that time.

<u>Felder Intervenes and Tries to Stop Sexual Harassment at the Gillette Stadium Event</u>

37.      On or about July 26, 2022, Felder learned that, due to scheduling conflicts, an SVP and other members of the management team from the Discovery side could no longer attend the event, but that Spicer, the WarnerMedia VP who had approved the event, would be attending.

38.      Despite a busy schedule and a morning work commitment, Felder decided to attend as a show of support to the account executives planning the event given the multiple cancellations.

39.      Felder checked into the Boston hotel approximately 25 minutes before the bus that WBD had booked for the event left for Gillette Stadium.

40.      Without Felder's approval, but, on information and belief and consistent with most events at Gillette Stadium, including those that WBD had previously hosted, other employees had apparently organized seating, tables, decor, drinks (both non-alcoholic and alcoholic), and food in the stadium parking lot for the two hours before the concert.

41.     Both WBD employees and clients complimented those who set up this part of the event.

42.     On information and belief, WBD's Alcohol Policy, at the time, allowed alcoholic beverages to be served at WBD events (even without food being served) but prohibited its employees from "drinking alcohol in excess" at such events, which Felder did not.

43.     When Felder arrived in the stadium premium suite WBD had booked for the concert, there was more food and an attendant (a stadium employee) working the bar was the only person with access to drinks.

44.     During the concert, a woman who worked for the client ("the client-employee"), had been dancing and speaking with a male WBD employee, M.S.

45.     Felder did not know M.S. well although he was aware that M.S. was married. M.S. did not report to Felder.

46.     Within the first hour of the concert, Felder noticed that the female client-employee was becoming visibly intoxicated and needed to lean on furniture for support.

47.     Felder worked with the intoxicated client-employee's supervisor (with whom he had a professional relationship), to separate the client-employee from M.S.

48.     Despite the client-employee's inebriated state, M.S. continued to flirt with her.

49.     The client-employee's supervisor expressed to Felder her embarrassment at her employee's behavior and voiced her appreciation for Felder's support and assistance.

50.     As the night wore on, the client-employee began vomiting and M.S., the male WBD employee, tried to approach and touch her.

51.     Felder and the client-employee's supervisor asked M.S. to leave, which he did.

52.     The client-employee's supervisor took her report to a private bathroom and

asked Felder to leave in the hopes of not drawing attention to her employee.  At one point, Felder approached the bathroom to check in on the situation and, to his surprise, found M.S. exiting the bathroom that the client-employee's supervisor and her report were in.

53.      The following week, after Felder reported the incident as detailed below, the client-employee's supervisor told him that M.S. had begun kissing the client-employee and, at one point, accidentally grabbed the client-employee's supervisor in an attempt to touch the client-employee inside the bathroom.  Felder was not aware of this incident during the concert.

54.      After the concert ended, Felder and the client-employee's supervisor assisted her report out of the suite, through the parking lot, and back on the bus, which was physically difficult given the client-employee's state of intoxication. Once again, the client-employee's supervisor expressed enormous gratitude to Felder for his assistance.

55.      Felder then stepped off the bus to call another WBD employee who had not yet arrived back to the bus.

56.      After Felder returned to the bus, he was surprised to see that M.S. was sitting next to the client-employee, who was sleeping.

57.      Felder did not see M.S. touch or speak to the client-employee.  He later learned, however after he reported the incident, that M.S. had been touching the client-employee on the bus.

58.      Felder asked M.S. to move seats, but he refused. Felder then enlisted the assistance of two other WBD employees who were similarly unable to convince M.S. to move. At that point, Felder and a group of coworkers relocated the client-employee.

59.      The client-employee, who lived in or around Boston, did not have a room booked at the hotel. Felder believed that it would be unsafe for the client-employee to travel

home by herself in her intoxicated state. Accordingly, he and her supervisor attempted to reach the client-employee's roommate but learned that the roommate was out of town.

60.     WBD offered to obtain a hotel room for the client-employee, but her supervisor did not want her to be alone.  Instead, her supervisor opted to put the client-employee in a room with a female WBD employee.

61.     Felder and the supervisor assisted the client-employee to the room and, before departing for her Uber, the supervisor again thanked Felder for everything he had done to help with the difficult situation.

62.     The client-employee's supervisor thanked Felder again via email the following morning.

<u>Felder Reports Sexual Misconduct to WBD</u>

63.     The next day, July 29, 2022, which was a Friday, Felder returned to New York, arriving around 4:00 pm.

64.     Felder decided to wait to report the incident until the following Monday for several reasons.

65.     First, Kornett, Felder's supervisor, was out of the office that day and, as described below, Company practice was to alert management before raising concerns with Human Resources.

66.     Second, WBD's offices at that time closed at 1:00 p.m. for "Summer Fridays," and Felder did not arrive in New York until approximately 4:00 p.m. after the office had closed.

67.     Third, Felder wanted to speak with the client-employee's supervisor before reporting the incident, as he had not witnessed the events that happened in the bathroom and wanted to ask her for more information. Felder understood that the client-employee's supervisor

was not available when he arrived in New York on Friday afternoon and that she wanted to speak with him on Monday.

68.     At approximately 9:00 a.m. on the following Monday, August 1, 2022, when Kornett was back in the office, Felder reported the incident to his supervisor.

69.     Kornett told Felder she would report it to her supervisor, Regis, and then follow up with Felder.  Kornett instructed Felder not to speak with Human Resources in the meantime. Later that day, Kornett informed Felder that she had shared his report with Regis.

70.     Shortly thereafter, Felder received a call from Regis, who told Felder he did not "get it."  Regis further said, in sum and substance, "If two people want to fuck, why can't they just leave separately from the event and go meet up in a room; that's how it used to be done." Felder explained to Regis that this was not an instance of two people "hooking up." When Regis realized that his comment disturbed Felder, he changed his tone.

71.     This was not the only time Regis downplayed the incident.  Regis at all times seemed more concerned with WBD's relationship with the client involved in the event than with employee safety or workplace culture. Indeed, because Felder was the sales management lead for a large deal that WBD had closed with that client two days before the event, Regis asked him to connect with the client to find out how they were feeling about the situation.

72.     Thus, at Regis's request, during the afternoon of August 1, 2022, Felder spoke with the client-employee's supervisor about the event and learned, as described above, more details about M.S.'s conduct that he had not personally observed and about which he was not aware at the time.

73.     Later that day, Felder had a call with Regis and Kornett during which he disclosed everything he had observed at the event as well as what he had just learned from the

client.

74.     Felder asked if he should further escalate the matter to his People & Culture

("P&C") (i.e., Human Resources) Business Partner, Anna Wingert ("Wingert").  Regis told him

not to do so.  Regis assured Felder that he would report it to Wingert as well as the Chief U.S. Ad

Sales Officer, Steinlauf, and get back to Felder.

75.     Felder reiterated his request and asked whether it was more appropriate for him

to speak with Wingert and Steinlauf directly because he was the one to initially report the

incident, but Regis told him to "sit tight."

76.     Felder, having heard nothing further by the following morning Tuesday, August

2, 2022, reached out to Wingert, his P&C Business Partner and told her everything he had

observed at the event. Wingert directed Felder not to discuss the matter with anyone unless

instructed otherwise.

77.     On information and belief, that evening on August 2, 2022, Steinlauf, Regis, and

Kit Herrera (Wingert's Supervisor and SVP of P&C) had a meeting with the client.  No one from

either WBD or the client who had attended the event was present for that meeting.

78.     On August 4, 2022, Felder asked Kornett (Felder's supervisor) if she would have

gone directly to Human Resources to report the incident. Kornett told Felder that she did not

think it was appropriate to go to Human Resources without first discussing the matter with a

supervisor.  She further explained that this is the reason she reported the matter to her supervisor

Regis rather than Human Resources. On information and belief, Kornett's advice to Felder was

the practice for making complaints within the sales organization at that time.

79.     On Friday, August 5, 2022, Felder met with a WBD investigator for

approximately an hour.  During that meeting, Felder spoke candidly, describing everything he

had personally observed and everything he had learned since originally reporting the matter.

80.    The investigator thanked Felder for coming forward and sharing everything that he had. The investigator also assured Felder that he was not the subject of any investigation and that WBD had a strong "no retaliation" policy (which the investigator read aloud) for participating in investigations such as these.

81.    While Felder was scheduled to meet with Wingert for an unrelated standing meeting on August 12, 2022, he asked to meet with her earlier because WBD had not taken any apparent disciplinary action against M.S., the WBD employee who committed the misconduct Felder had reported.

82.    During his call with Wingert on August 11, 2022, Felder asked why he continued to see M.S. in the office and on correspondence with clients.  Felder explained that clients who had been at the event were questioning why the employee was still working as though it was business as usual.

83.    Felder asked Wingert for talking points he could use to answer client inquiries about M.S.  Wingert told Felder that he had to "let this take its course," that "these things take time," and that he was not allowed to talk to clients about the situation.

<u>WBD Fires Felder in Retaliation for His Protected Activity</u>

84.    Approximately two weeks after Felder reported the sexual harassment, the Company fired him.

85.    On August 17, 2022, while Felder was on a pre-approved vacation, Wingert asked him to send her all emails concerning the approval for the event, which he did, and asked whether the entertainment before the concert had been approved.  Felder explained how the approval process for the event took place, and Wingert did not ask for any other information.

86.    The following day, on August 18, 2022, while Felder was still on vacation, Regis and Wingert set up a Zoom meeting with Felder to tell him that he was being fired "for cause."

87.    Regis and Wingert explained that WBD was dismissing Felder because purportedly he was the "senior ranking manager" in attendance at an event where a violation of the Alcohol Policy occurred.  Contrary to the explanation, Felder had not violated the Company's Alcohol Policy and he was not the senior ranking manager at the event.

88.    Regis and Wingert further told Felder that he would not be receiving any separation or severance pay.

89.    Additionally, Regis mentioned in the meeting that the entertainment before the concert had not been approved, even though this purported problem was not given as a reason for dismissal.

90.    Felder immediately stated that he believed this dismissal was in retaliation for coming forward and cooperating in the investigation.  Felder also reminded Regis and Wingert that Spicer, who had been a VP far longer than he had, had attended the event and thus Felder was not "the senior leader" at the event. Regis expressed surprise to "learn" Spicer attended the event even though Felder had repeatedly reported that fact.

91.    At no time during the firing meeting did Regis or Wingert ask Felder for, or give him the chance to provide, details concerning his involvement in the approval of the event or his actions at the event.

92.    To make matters worse, as a result of WBD's improper classification of his dismissal as "for cause," WBD: (i) refused to pay Felder his earned 2022 bonus (20% of his total compensation, half of which was calculated based on objective U.S. ad sales results and half of which was calculated based on objective N.Y. ad sales results); (ii) cancelled Felder's unvested

deferred compensation; and (iii) failed to pay Felder severance.

<u>WBD Relies on Pretextual Reasons for Their Unlawful and Retaliatory Firing of Felder</u>

93.    On information and belief, WBD's rationale for firing Felder was pretextual.

94.    First, on information and belief, rather than punishing Spicer, the other VP in attendance at the event, WBD paid him according to a Voluntary Separation package which included at least four weeks of pay and benefits per year of service, his pro-rated bonus, and full vesting of all equity awards granted prior to April 8, 2022. Unlike Felder, Spicer had actually approved the event and had done nothing to mitigate the sexual misconduct he witnessed there.

95.    Second, WBD did not discipline Regis, Kornett, or any other individuals involved in approving the event.

96.    Third, WBD allegedly found that other employees had breached its Code of Ethics and Alcohol Policy in connection with the event, including those who actually purchased the alcohol for the event.  However, WBD merely issued those employees a written warning and the Company continues to employ them.

97.    Following his discharge, Felder learned that P&C Business Partner Wingert had reached out to the organizers of the event asking who had provided "gummies", a reference to marijuana edibles, during the event.  WBD never asked Felder about marijuana edibles or made him aware of the presence of marijuana at the concert.

98.    No one had offered Felder gummies and he did not see them being distributed, but he later learned that a WBD Account Executive brought them and handed them out. At the time of the event, the Account Executive reported to Spicer, the more senior VP who was present at the event.  Felder met the Account Executive for the first time at the event and did not interact with her beyond an introduction and brief conversation.

99.    Employees of both WBD and the client consumed the gummies.  As set forth above, WBD did not fire those employees for distributing or taking gummies.

100.    Fourth, on information and belief, WBD has never fired any other leader merely for being present at an event where an incident occurred. For example, at an event in Las Vegas in 2009, Felder assisted Steinlauf (who was then an SVP of Sales) with an intoxicated Account Executive who threw a punch at Felder's then-supervisor, a VP. Upon information and belief, Steinlauf reported this incident several days after it occurred and, on information and belief, the Company did not discipline Steinlauf or the Account Executive.

101.    Fifth, it is common for WBD (and others in the industry) to host "pre-event" events at which alcohol is served, including at the TNT All-Star Weekend, the New York Wine & Food Festival, and informal events such as those that take place at the Dream Home Winner Weekend.

102.    On information and belief, a WBD SVP needed to be removed from a client event at the 2021 NYC Wine and Food Festival because he was intoxicated and belligerent in front of many WBD employees and clients. On information and belief, the Company took no disciplinary action against the employee or the "senior sales leader" in attendance.

103.    Finally, on information and belief, WBD has, on several occasions, allowed employees who actually engaged in sexual misconduct to leave voluntarily with severance packages.  WBD has also knowingly turned a blind eye to interoffice relationships between colleagues (at both equal and more senior reporting levels) for many years.

<u>Felder Challenges His Firing</u>

104.    On August 20, 2022, Felder wrote to Regis, Wingert, and Steinlauf, asking that WBD reconsider the dismissal and either: (i) reinstate him; or, in the alternative, (ii) retract the false "for cause" nature of the discharge.

105.    Felder pointed out, among other things, that:

(i) there was no legitimate reason for his firing;

(ii) he had not yet been provided a chance to correct the purported record as he was never asked any questions about his involvement, or lack of involvement, in planning the evening;

(iii) his actions were in line with, and indeed above and beyond, professional training as well as client direction and Felder did his best to ensure all policies were followed even though he had no supervisory authority over either individual involved; he intervened to ensure the safety of all for which the clients thanked him; he proactively reported the situation to make sure it was addressed by Human Resources, for which Human Resources thanked him; and he followed the company's instructions in every way with respect to this report;

(iv) approval for the event came from two levels above him, as well as the more senior VP, Spicer, who also attended the event but took no action to intervene or assist with the situation; and

(v)  there is no WBD policy against "pre-event" entertaining.

106.    WBD provided no substantive response to Felder's request. Instead, on August 22, 2022, WBD sent him a letter confirming Felder's dismissal.

107.    The letter contained false statements, including that the investigation "was conducted based on allegations raised by [WBD's] client."  This was not true.  The investigation was conducted based on allegations Felder had raised.

108.    The August 22, 2022 letter also falsely stated that Felder had "breached the Discovery Code of Ethics, along with its Alcohol Policies" and that "[a]s the senior leader at the event, [Felder] had a duty to ensure that the applicable Code of Ethics, Anti-Harassment and

Consumption of Alcohol were adhered to by our employees at all times." To the contrary, any diligent and complete investigation would have shown that Felder was not the "senior leader" at the event and that he took all reasonable steps to ensure that WBD employees, including those who did not report to him, were adhering to WBD's policies.

109.    Indeed, on information and belief, there had been no violations of WBD's Alcohol Policy. When WBD issued the event's organizers written warnings as described above, no one was able to explain what policy had been violated.

110.    The Company's P&C team told the organizers they would follow up with an explanation later but, on information and belief, no one ever provided the event's organizers with specifics about the purported policy violation.

111.    Further, since the termination of Felder's employment, WBD's P&C team has held multiple training sessions with the Sales team on the Company's policies, including the Alcohol Policy.

112.    Felder is aware of communications between WBD P&C and the Sales leadership acknowledging that the Company was holding the trainings because it needed to clarify and better define its policies.  Yet the Company fired Felder because he supposedly violated rules that WBD concedes were ambiguous at the time of his purported non-compliance.

113.    The August 22, 2022 letter also falsely stated that Felder's discharge was "for cause due to failure in following the expectations of an employee set forth in the Discovery Code of Ethics and the practices in the aforementioned policies."

114.    On information and belief, multiple WBD employees saw and/or heard about this damaging letter.

115.    On August 24, 2022, Felder wrote, via counsel, to WBD to reiterate his request

for "the due process of responding to the false allegations made against [him] (which he had never been given)" as well as reinstatement or a firing "without cause."

116.    Felder's counsel also pointed out that WBD: (i) had "clearly ignored" the facts; (ii) was obligated "to complete a full and fair investigation, to reach fair and reasonable conclusions, and to implement appropriate, balanced, and consistent remedies based on all of the attendant facts"; and (iii) "failed to do a diligent investigation and/or is choosing to disregard the truth in order to scapegoat Felder to appear strong in the face of a PR issue and to punish him for bringing this to light in the first place."

117.    Felder's attorney also requested that WBD provide its definition of "cause" as well as the Code of Ethics, Anti-Harassment, and Consumption of Alcohol Policies referenced in Felder's firing letter and identify of any specific sections of the code and policies that Felder had allegedly breached.  WBD has never provided the requested information.

118.    Felder's counsel, having received no response, reached out again on September 1, 2022.

119.    Laying bare the pretextual nature of WBD's decision to fire Felder, four and a half hours later, WBD's counsel sent Felder's attorneys a letter shifting the Company's reason for his discharge from being the "senior leader" at an event where the Alcohol Policy was supposedly violated, to four new reasons for discharge never previously communicated to Felder.

120.    These reasons included: (i) "participating in and helping organize" the event (which Felder did not) "where numerous attendees became overly and unsafely intoxicated"; (ii) "failing to remove the male employee from the event"; (iii) "failing to monitor the male employee"; and (iv) "waiting more than three full days [including the day Felder's supervisor was out of the office and the weekend] to report the incident within WBD, despite WBD's

policies requiring immediate reporting."

121.    Once again, WBD sought to hold Felder to a higher standard than was required pursuant to the Company's policies and practices.  For example, on information and belief, WBD's Code of Conduct at the time of the incident required "prompt[] reporting."  Certainly, Felder acted promptly under any standard in reporting the incident on the second business day after it occurred.

122.    Because the policy was unclear or insufficient, based on the incident detailed above, WBD has changed its policy in that regard.  On September 14, 2022, the Company held an updated training concerning, among other things, the reporting of sexual harassment.

123.    Also, while the Company now asserts that Felder's report was untimely, it took the Company approximately two weeks to address the harassment.  As set forth above, approximately 10 days after Felder reported the sexual harassment, he raised concerns because the harasser, M.S., continued to work for the Company.  Apparently recognizing that the circumstances surrounding the incident were complicated, Felder's P&C Business Partner, Wingert, told him that he had to "let this [investigation] take its course" and that "these things take time."

124.    By firing him for his failure to "remove" the male employee, M.S., from the event, WBD essentially held Felder to the standards of a bouncer or security guard. The Company has not imposed this unreasonable expectation on other managers.

## FIRST CAUSE OF ACTION

## Retaliation Under Title VII

125.    Plaintiff repeats and realleges paragraphs 1 to 124 of this Complaint as if fully set forth herein.

126.    By the acts and practices described above, defendant has retaliated against plaintiff in the terms, conditions, and privileges of his employment for his protected activity in violation of Title VII.

127.    Defendant has acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

128.    As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer economic damage, irreparable injury, emotional distress, reputational injury, and other compensable damages.

## SECOND CAUSE OF ACTION

## Retaliation under the NYSHRL

129.    Plaintiff repeats and realleges paragraphs 1 through 128 of this Complaint as if fully set forth herein.

130.    By the acts and practices described above, defendant has retaliated against plaintiff for his protected activity in violation of NYSHRL.

131.    Defendant has acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

132.    As a result of defendant's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

<u>THIRD CAUSE OF ACTION</u>

<u>Retaliation Under the NYCHRL</u>

133.    Plaintiff repeats and realleges paragraphs 1 through 132 of this Complaint as if fully set forth herein.

134.    By the acts and practices described above, defendant has retaliated against plaintiff due to his protected activity in violation of NYCHRL.

135.    Defendant retaliated against plaintiff with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

136.    As a result of defendant's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a)    Declaring that the acts and practices complained of herein violate Title VII, the NYSHRL, and the NYCHRL;

(b)    Enjoining and permanently restraining defendant from violating Title VII, the NYSHRL, and the NYCHRL;

(c)    Directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff and his employment opportunities;

(d)    Directing defendant to place plaintiff in the position he would have occupied but for defendant's discriminatory treatment, and making him whole for all the earnings and benefits he would have received but for defendant's discriminatory treatment, including, but not limited to, wages, bonuses, and pension and retirement, health care coverage and other lost benefits benefits;

(e)    Directing defendant to pay plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

(f)    Directing defendant to pay an additional amount as punitive damages for its willful and/or reckless disregard of plaintiff's statutory rights;

(g)    Awarding plaintiff reasonable attorneys' fees and costs;

(h)    Awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(i)    Granting plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

(j)    Granting such other and further relief as the Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: September 26, 2023
       New York, New York

                              VLADECK, RASKIN & CLARK, P.C.

                    By: _____
                              Jeremiah Iadevaia
                              Emily Bass
                              111 Broadway, Suite 1505
                              New York, New York 10006
                              (212) 403-7300