**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

MATTHEW ISAAC FELDER,

                         Plaintiff,

           -against-

WARNER BROS. DISCOVERY, INC.,

                       Defendant.

----------------------------------------------------------------X

**23 Civ. No. 08487 (AT) (GS)**

**<u>OPINION & ORDER</u>**

**GARY STEIN, United States Magistrate Judge:**

      This employment retaliation lawsuit between Plaintiff Matthew Isaac Felder ("Felder") and Defendant Warner Bros. Discovery, Inc. ("WBD") has spawned an abundance of discovery disputes. Three separate motions are pending before the Court. First, Felder moves to compel production of several categories of comparator information (both as to identified comparators and for the purposes of identifying further comparators), documents related to his performance, and searches for electronically stored information ("ESI"). (Dkt. No. 29). Second, Felder also moves to compel production of documents concerning an internal investigation conducted by WBD following the events that resulted in Felder's termination. (Dkt. No. 33). Third, WBD moves for a protective order to block the depositions of three of its executives. (Dkt. No. 36).

      For the reasons set forth below, Felder's motion to compel comparator information, documents related to his performance, and ESI searches is **GRANTED IN PART** and **DENIED IN PART**; Felder's motion to compel documents relating

to WBD's internal investigation is **GRANTED IN PART** and **DENIED IN PART**; and WBD's motion for a protective order barring depositions is **DENIED**.

BACKGROUND

### A. Factual Background

After receiving a right to sue notice from the Equal Employment Opportunity Commission ("EEOC"), Felder commenced this action against WBD, his former employer, on September 26, 2023. (Dkt. No. 1 ("Complaint" or "Compl.") ¶ 13). Felder's Complaint alleges that WBD retaliated against him in violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. (*Id.* ¶ 7). Felder held sales positions at WBD or its predecessors for nearly 20 years, and was promoted to Vice President of Integrated Ad Sales in 2021. (*Id.* ¶¶ 16-20).

Felder helped plan an offsite WBD-sponsored event at an Elton John concert in Massachusetts ("Event"), along with a pre-Event tailgate, and attended both on Thursday, July 28, 2022. (*Id.* ¶¶ 25-31, 38-40). At the Event, Felder observed an intoxicated WBD employee ("M.S.") inappropriately interacting with a representative of a WBD client who was also intoxicated. (*Id.* ¶¶ 44-52). Felder asserts he took action to separate and protect the client representative from M.S. (*Id.* ¶¶ 47, 51, 58-61). Felder reported this incident to his supervisors at WBD four days later, on the following Monday, August 1, 2022. (*Id.* ¶¶ 44-52). Nonetheless, following an internal investigation, WBD fired Felder for cause on August 18, 2022. (*Id.* ¶¶ 79-80, 86).

2

Felder alleges that WBD's proffered justifications for firing him included, *inter alia*, that "he was the 'senior ranking manager' in attendance at an event where a violation of the Alcohol Policy occurred;" that he "fail[ed] to monitor" and "fail[ed] to remove" M.S. from the Event; and that he waited too long to report the incident, "despite WBD's policies requiring immediate reporting." (*Id.* ¶¶ 87, 120). Felder asserts that WBD's justifications are pretextual and that the real reason he was terminated is that he reported to WBD the sexual harassment by M.S. that occurred at the Event. (*Id.* ¶¶ 93-103). As such, Felder seeks the production of documents and information which might evidence the fact that his own firing reflected an atypical response to the kind of infraction of which he was accused, thereby suggesting the purported reasons WBD provided for his termination are merely pretextual. (Dkt. Nos. 29, 33).

## B. Procedural History

Felder filed a Letter-Motion dated September 12, 2024, moving to compel WBD to produce documents concerning his performance, comparator information (both as to identified comparators and for the purposes of identifying other comparators), and WBD policy changes, and to require WBD to run specific ESI searches. (Dkt. No. 29). WBD filed a reply dated September 17, 2024 in opposition to Felder's Letter-Motion, generally claiming that Felder's requests are overly broad, unduly burdensome and largely irrelevant to Felder's retaliation claims. (Dkt. No. 30).

Felder filed a subsequent Letter-Motion dated September 25, 2024, moving to compel WBD to produce documents and communications related to its internal investigation of the incidents surrounding the Event ("Investigation").  (Dkt. No. 33).  WBD filed a reply to Felder's second Letter-Motion dated September 30, 2024, objecting that the requested Investigation files consist of privileged communications and attorney work product, and that WBD has not waived any relevant privilege over these files.  (Dkt. No. 34).

WBD filed a subsequent Letter-Motion dated October 3, 2024, requesting a conference to permit WBD to seek a protective order preventing the depositions of three high-level executives: Jon Steinlauf, Kit Herrera, and Michele Kornett.  (Dkt. No. 36).  Felder filed a reply to WBD's Letter-Motion dated October 8, 2024, arguing that the apex doctrine, cited in support of WBD's request for the protective order, is inapplicable to the named executives, and that the burden to WBD of such depositions is minimal.  (Dkt. No. 39).

On October 11, 2024, the Court held a discovery conference ("Discovery Conference") and heard oral argument.  (Dkt. Nos. 35, 38, 41 ("Tr.")).  At the Discovery Conference, the Court directed the parties to engage in a further meet-and-confer effort to resolve the disputes raised by Felder's September 12 Letter-Motion with the benefit of guidance provided by the Court during the conference.  (Tr. 118:1-13).  The Court also invited the parties to file supplemental letter briefs regarding Felder's September 25 Letter-Motion for Investigation materials and

regarding any remaining issues relating to the September 12 Letter-Motion. (Tr. 116:22-117:16).

Supplemental letter briefs were filed by both parties on November 15, 2024 in support of their respective positions on Felder's motion to compel production of files pertaining to the Investigation. (Dkt. Nos. 44, 45). WBD filed a supplemental letter brief regarding comparator evidence and the date range for ESI discovery on December 10, 2024 (Dkt. No. 50), which it further supplemented on January 3, 2025 (Dkt. No. 53). WBD claimed that its production of additional documents following the Discovery Conference had resolved other disputes arising from Felder's September 12 Letter-Motion. (Dkt. No. 50 at 1-2). Felder filed a supplemental letter brief on January 3, 2025 disputing WBD's claim that many of the issues had been resolved and further supporting his requests. (Dkt. No. 54).

**LEGAL STANDARDS**

### A. Motion to Compel Discovery

Under Federal Rule of Civil Procedure 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In evaluating what information is discoverable, the court "consider[s] the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery

outweighs its likely benefit." *Id.* The information sought need not be admissible at trial to be discoverable. *Id.*

Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any party's claim or defense." *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) (cleaned up). "To satisfy this standard, 'the moving party must articulate a concrete linkage between the discovery sought and the claims or defenses asserted in the case.'" *Ekstein v. Poito Assoc.*, No. 20 Civ. 1878 (JCM), 2022 WL 783000, at *3 (S.D.N.Y. Mar. 15, 2022) (quoting *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16 Civ. 2242 (VEC), 2018 WL 4112816, at *1 (S.D.N.Y. Aug. 29, 2018)) (cleaned up).

The party moving to compel discovery "bears the initial burden of demonstrating that the information sought is relevant and proportional." *Sportvision, Inc. v. MLB Advanced Media, L.P.*, No. 18 Civ. 3025 (PGG) (VF), 2022 WL 2817141, at *1 (S.D.N.Y. July 19, 2022); *see also Citizens Union of City of N.Y. v. Attorney General of N.Y.*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017) ("Plaintiffs, as the parties seeking discovery from [defendant], bear the initial burden of proving that the information and documents sought are relevant and proportional to the needs of the case."). Once the moving party has made this showing, "the burden shifts to the opposing party to justify curtailing discovery." *Sportvision*, 2022 WL 2817141, at *1; *see also Luv N' Care, Ltd. v. Eazy-PZ, LLC,* No. 18 Misc. 491 (JPO), 2018 WL 6067231, at *1 (S.D.N.Y. Nov. 20, 2018) ("[T]he party withholding

discovery on the grounds of burden, expense, privilege, or work product bears the burden of proving the discovery is in fact privileged or work product, unduly burdensome and/or expensive.") (citation omitted).

Federal district courts have broad discretion in ruling on a motion to compel discovery.  *See Grand Cent. P'ship. v. Cuomo*, 166 F.3d 473, 488 (2d Cir. 1999); *see also EM Ltd. v. Rep. of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) ("A district court has broad latitude to determine the scope of discovery and to manage the discovery process.").

## B. Motion for Protective Order Barring Depositions

Under Fed. R. Civ. P. 26(c)(1), "[a] party or any person from whom discovery is sought may move for a protective order," which the court may issue for "good cause" shown.  Normally, the party seeking to bar a deposition noticed under Fed. R. Civ. P. 30 bears the burden of demonstrating that the proposed deposition would not lead to relevant information.  *Speadmark, Inc. v. Federated Dept. Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y. 1997); *see also Scott v. Chipotle Mexican Grill, Inc.*, 306 F.R.D. 120, 122 (S.D.N.Y. 2015) ("'[P]laintiffs have no burden to show that the deponents have any relevant knowledge.'") (citation omitted).

Although Rule 30 specifies that a party may depose "any person" without leave of court and does not have a specific carve out for top executives, "courts nevertheless have developed the so-called apex doctrine when evaluating objections to the deposition of a senior corporate executive."  *GMO Gamecenter USA, Inc. v. Whinstone US, Corp.*, No. 22 Civ. 5974 (JPC) (KHP), 2024 WL 3833882, at *4

(S.D.N.Y. Aug. 14, 2024). Under this doctrine, a high-level executive is generally safeguarded from being deposed absent a showing that the executive has unique evidence or personal knowledge of the claims at issue or that other witnesses are incapable of providing the relevant testimony. *Id*.; *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 17 Civ. 6221 (KPF), 2020 WL 6273396, at *1 (S.D.N.Y. Aug. 28, 2020). "Generally, where a party seeks to avoid an apex deposition, it bears the burden of showing good cause for why the deposition should not be allowed." *GMO Gamecenter*, 2024 WL 3833882, at *4; *see also Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) ("The party seeking a protective order has the burden of showing that good cause exists for issuance of that order.") (citation omitted).

## DISCUSSION

The plethora of discovery disputes here may be divided into six roughly discrete categories: (1) Felder's requests for documents which might aid in the identification of comparators; (2) Felder's requests for documents pertaining to identified comparators; (3) Felder's requests for documents related to his job performance; (4) the parameters of WBD's searches for ESI; (5) Felder's requests for documents related to WBD's internal investigation; and (6) WBD's request for a protective order barring depositions of its top executives.[1] The Court will address each issue in turn.

---

[1] Felder's January 3 letter agrees with WBD's assertion that the dispute relating to Felder's request for documents relating to changes in WBD policies has been resolved. (Dkt. No. 54 at 4; *see* Dkt. No. 50 at 2). Hence, that issue will not be further discussed in this opinion.

## A. Potential Comparators

Several of Felder's discovery requests seek information which may aid in the identification of comparators, including documents concerning other WBD executives who were accused of similar misconduct; documents concerning other WBD executives who were fired for cause; complaints and other lawsuits by WBD executives alleging retaliation or sexual harassment; and job descriptions for certain WBD employees Felder contends could be comparators. (Dkt. No. 29 at 2).

The parties do not dispute that comparator evidence is relevant to Felder's retaliation claims. Felder can show retaliation by comparing WBD's treatment of him to that of similarly situated employees within and outside of his protected class, including those who made protected complaints and those who engaged in similar alleged misconduct. *See, e.g.*, *Chan v. NYU Downtown Hosp.*, No. 03 Civ. 3003 (CBM), 2004 WL 1886009, at *6 (S.D.N.Y. Aug. 23, 2004) ("Information regarding other complaints of sexual harassment made by defendants' employees and actions taken in response thereto is clearly relevant to plaintiff's ability to make out her prima facie case of retaliation."); *see also King v. Aramark Servs., Inc.*, 96 F.4th 546, 563 (2d Cir. 2024) (differential treatment of those outside plaintiff's protected class is a "recognized method" of raising an inference of bias).

However, WBD argues that it has produced all available comparator evidence regarding the individuals Felder has identified as comparators, and that "discovery into unknown comparators" is unwarranted. (Dkt. No. 50 at 3). WBD is incorrect. Discovery into potential comparators is a well-recognized purpose of discovery in an

9

employment discrimination or retaliation case.  *See, e.g.*, *Metcalf v. Yale Univ.*, No. 15-cv-1696 (VAB), 2017 WL 627423, at *4 (D. Conn. Feb. 15, 2017) (finding that plaintiff's discovery requests were relevant under Rule 26(b)(1) "because the requested documents concern potential comparators"); *Vuona v. Merrill Lynch & Co.*, No. 10 Civ. 6529 (PAE), 2011 WL 5553709, at *4 (S.D.N.Y. Nov. 15, 2011) ("The purpose of discovery here is, in part, to help identify the universe of proper comparators.").

With these background principles in mind, the Court now turns to WBD's objections to each of Felder's specific requests relating to potential comparators, as well as its objection to Felder's proposed time period to govern these requests.

### 1.  Similar Misconduct

Felder seeks "documents concerning any VPs, SVPs, and EVPs who purportedly engaged in any of the following misconduct between August 1, 2020 and August 31, 2024: organizing/planning an off-site event at which attendees became intoxicated; failing to remove another employee from a WBD event; failing to monitor another employee at a WBD event; *or* failing to promptly report a violation of WBD's policies."  (Dkt. 29 at 2 n.10) (emphasis added).

WBD disputes what constitutes relevantly similar conduct to Felder's conduct.  (Dkt. No. 30 at 2).  WBD defines Felder's comparators to be any VPs, SVPs, and EVPs who (a) "approved an event that violated alcohol policy, had opportunities to and failed to prevent sexual harassment, *and* failed to promptly report sexual harassment—*and* were subject to discipline by the same decision-

maker" or (b) "who reported sexual harassment or retaliation for reporting sexual harassment." (*Id.*) (second emphasis added). WBD states it has searched for but "not found any employee that fits these criteria." (*Id.*). WBD justifies its comparator definition on the basis that Felder "fails to appreciate the specific combination of decisions that Plaintiff made and their consequences and how they formed the basis for his termination." (*Id.* at 3).

WBD's definition of the range of potential comparators—which essentially incorporates all of the specific circumstances concerning Felder's termination—is unduly narrow. Although a comparator must be "similarly situated in all material respects," the Second Circuit has "made it clear that this rule does not require a precise identicality between comparators and the plaintiff." *Matusick v. Erie County Water Auth.*, 757 F.3d 31, 54 (2d Cir. 2014). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). Thus, courts have (by way of example) rejected WBD's proposed "same decision-maker" limitation on the definition of a comparator. *See Metcalf*, 2017 WL 627423, at *4 ("even if . . . Mr. Reynolds was not the ultimate decision-maker for any of the other employees whose files are covered by [plaintiff's discovery request], this does not preclude [plaintiff] from showing that the other employees are similarly situated enough to be potential comparators").

11

Moreover, for purposes of discovery, Felder need not establish that his potential comparators are similarly situated to him in all material respects. WBD cites several cases applying that standard. (Dkt. No. 50 at 4 (citing *Shumway v. United Parcel Serv.,* 118 F.3d 60, 64 (2d Cir. 1997); *Baity v. Kralik,* 51 F. Supp. 3d 414, 449 (S.D.N.Y. 2014); *Guzman v. Crothall Healthcare Inc.*, No. 17 Civ. 4306 (CBA)(PK), 2021 WL 5048993, at *11 (E.D.N.Y. Sept. 29, 2021)). But as Felder correctly points out, those cases are inapposite, as they were decided at the summary judgment stage. (Dkt. No. 54 at 2 n.8). The standard for allowing discovery of potential comparators is more liberal. *See, e.g.*, *Vuona*, 2011 WL 5553709, at *4 (rejecting defendant's reliance on *Shumway* to limit discovery as to potential comparators and explaining that "the procedural posture of *Shumway* . . . is distinct from that here," as *Shumway* "was considering not a discovery issue, but the resolution of a motion for summary judgment. . . . Here, without discovery, it is premature to predict how the principle set forth in *Shumway* will apply[.]"); *see also Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 562 (S.D.N.Y. 2013) ("courts typically apply more 'liberal civil discovery rules' in employment discrimination cases, giving plaintiffs 'broad access to employers' records in an effort to document their claims'") (cleaned up); Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").

Accordingly, WBD must produce Felder's requested documents regarding similar misconduct by WBD employees for the time period identified below.

12

### 2.    Others Fired for Cause

Felder seeks "documents concerning VPs, SVPs, and EVPs who were fired for [c]ause between August 1, 2020 and August 31, 2024," including, *inter alia*, "HR documents or documents in the employee's personnel file related to the alleged misconduct." (Dkt. No. 29 at 2; Dkt. No. 54 at 4). WBD argues that this request is insufficiently relevant in that it would cover any form of "cause" for termination and may or may not involve the same decision-makers. (Dkt. 30 at 3).

At the Discovery Conference, the Court expressed skepticism that Felder's request was relevant to his retaliation claims, noting that to prove retaliation, it is not enough for Felder to show he was treated unfairly when he was fired for cause; he must instead show the real reason he was fired is that he reported sexual harassment. (Tr. at 31:25=32:5). Felder's counsel responded by arguing that if the evidence showed that other WBD executives who were fired for cause engaged in far more serious misconduct than what Felder was accused of, "that would show pretext." (*Id.* at 34:12-16). The Court asked counsel for authority supporting his position. (*Id.* at 35:6-9).

In his supplemental letter, Felder did not cite any discrimination or retaliation cases permitting discovery into other employees who were terminated. Instead, he cited *Bagley v. J.P. Morgan Chase & Co.*, No. 10 Civ. 1592 (PGG), 2012 WL 2866266, at *14 (S.D.N.Y. July 12, 2012). (Dkt. No. 54 at 4 n.12). *Bagley*, however, is inapposite. In that case, the court denied an employer's motion for summary judgment on a retaliation claim, finding sufficient evidence to show that

the employer's stated reason for terminating plaintiff was pretextual. *Bagley*, 2012 WL 2866266, at *11-16. Part of the court's reasoning—the part on which Felder relies—described evidence that plaintiff's managers "failed to follow Chase's Corrective Action Policy and practices in effecting [plaintiff's] termination," recommending that plaintiff be terminated even before he had been issued a written warning, which was "unusual." *Id*. at *14.

As the *Bagley* court noted, it is a familiar principle of discrimination law that this type of procedural irregularity, *i.e.*, a failure to follow the company's own internal procedures in terminating a plaintiff, "can . . . be evidence of pretext." *Id*. at *15 (collecting cases) (citation omitted). There is no similar principle recognizing the relevance in a discrimination or retaliation case of comparative evidence of the reasons why other employees were terminated. To the contrary, when plaintiffs have made broad discovery requests for information about terminations of other employees, courts have rejected those requests or limited them to employees similarly situated to the plaintiff. *See, e.g.*, *Harris v. Bronx Parent Housing Network, Inc.*, No. 18 Civ. 11681 (GBD) (SN), 2020 WL 763740, at *3 (S.D.N.Y. Feb. 14, 2020) (denying, as "overbroad," plaintiff's motion to compel defendant to answer interrogatory seeking identification of "each employee Defendant terminated during the Relevant Time Period," while noting that a more limited interrogatory directed at terminations of other disabled persons would likely be permissible); *Russo-Lubrano v. Brooklyn Fed. Sav. Bank*, No. 06 Civ. 672 (CPS) (VVP), 2007 WL 2126086, at *1 (E.D.N.Y. July 23, 2007) (limiting plaintiff's discovery requests for

all employees terminated during the relevant period to "the terminations of other employees who apparently shared the same supervisors as the plaintiff, and who are therefore likely to be the appropriate comparators").

Here, Felder seeks discovery into the terminations for cause of all VPs, SVPs, and EVPs during the relevant period, regardless of the reasons for the termination or the similarity of the circumstances of the termination to his own.  This request is overbroad, lacks support in the case law, and rests on a tenuous theory of relevance. Moreover, Felder's request for similar misconduct discovery, which the Court approved above, should identify situations where similarly situated employees were terminated for cause.  Accordingly, this prong of Felder's discovery requests is denied.

### 3.    Other Complaints

Felder seeks "complaints and/or lawsuits alleging retaliation or sexual harassment made by any VP, SVP, and EVP from August 1, 2020 to August 31, 2024." (Dkt. No. 54 at 4).[2]  WBD initially responded that it was willing to produce documents "in its proposed time period (8/22/21-8/22/23), if any exist, for employees in positions similar to Plaintiff who made similar reports."  (Dkt. No. 30 at 3).  WBD subsequently reported that "there is no VP-level employee who reported sexual harassment or retaliation for reporting sexual harassment between 2021 and 2023."

---

[2] Initially, Felder requested such complaints and/or lawsuits *against* any VP, SVP, or EVP.  (Dkt. No. 29 at 2).  After WBD pointed out that Felder had apparently phrased this request "backwards" (Dkt. No. 30 at 3), Felder agreed that what he intended to request was complaints and/or lawsuits *by* any VP, SVP, or EVP.  (Tr. at 35:11-19; Dkt. No. 54 at 4 n.13).

(Dkt. 50 at 3). Felder replies that this response is insufficient because it (1) does not address SVPs and EVPs; (2) does not address retaliation for reporting other types of discrimination besides sexual harassment; and (3) limits the time period to two years rather than Felder's requested four-year period. (Dkt. 54 at 4).

The Court finds Felder's first objection well taken. In fact, at the Discovery Conference, WBD's counsel agreed that WBD would produce information for "VPs, SVPs and EVPs." (Tr. at 36:15-16). It may be that by "VP-level," WBD's letter means to encompass SVPs and EVPs as well as VPs. If so, WBD should state this expressly; if not, WBD should produce any relevant documents for SVPs and EVPs or represent that there are none.

The Court overrules Felder's second objection. WBD's counsel further stated during the Discovery Conference that WBD would provide the information for VPs, SVPs and EVPs "who reported sexual harassment or *retaliation for reporting sexual harassment*," and Felder's counsel stated that Felder "has no objection to that." (*Id.* 36:14-19). In his supplemental letter, Felder advances no substantive reason for changing his position.

Finally, the Court addresses Felder's third objection below in discussing the time period for all of Felder's comparator requests.

Thus, WBD must produce complaints and/or lawsuits alleging sexual harassment or retaliation for reporting sexual harassment by any VP, SVP, or EVP for the time period identified below.

### 4. Time Period

For each of his requests for comparator information, Felder seeks documents and communications from August 1, 2020 to August 31, 2024, *i.e.*, approximately two years before and after his termination on August 22, 2022. (Dkt. 29 at 2 n.10). WBD contends that this timeframe is overbroad and proposes limiting the timeframe to one year before and after Felder's termination on August 22, 2022. (Dkt. No. 30 at 2).

The Court agrees with Felder on this point. Any comparator information from Felder's requested timeframe is potentially relevant to his retaliation claims and his argument that WBD's reason for his termination was pretextual. If a similarly-situated employee planned and attended an event in 2020 wherein sexual harassment occurred, for instance, WBD's response to this incident would have direct relevance to Felder's claims. Felder also cites cases that support his position on timeframe. (Dkt. No. 29 at 4 n.11 (citing *Chan,* 2004 WL 1886009, at *6 (limiting document request regarding other complaints of sexual harassment to two years preceding the start of plaintiff's employment to the "present," which was two years after her termination); *Bujnicki v. Am. Paving & Excavating, Inc.*, No. 99 Civ. 646S (SR), 2004 WL 1071736, at *3, *7 (W.D.N.Y. Feb. 25, 2004) (ordering comparator personnel records for two years before and after bias claims))).

The Court thus directs WBD to produce documents related to Felder's requests for similar misconduct and complaints and/or lawsuits by other VPs, SVPs, and EVPs for the period from August 1, 2020 to August 31, 2024.

17

### 5. Job Descriptions

Felder seeks job descriptions for Ad Sales VP Ryan Spicer, SVP Michele Kornet, VP Stan Soong, VP Jeff Pellegrini, SVP Jonathan LaConti, SVP Robert Latorre, EVP Greg Regis, EVP Karen Grinthal, and EVP Scott Kohn.  (Dkt. No. 29 at 2-3).  According to Felder, of the named individuals, WBD thus far has produced only a specific job description for Spicer and a generic job description for an EVP.  (Dkt. No. 54 at 2 n.6).  It has not produced any job description (even a generic one) for the SVPs.  (*Id.*).

WBD objects to Felder's request on the basis that Plaintiff "has not articulated a need for their job descriptions."  (Dkt. No. 30 at 3).  This objection is unavailing.  First, WBD misstates the standard for discoverable information under Rule 26, which extends to "any nonprivileged matter that is *relevant* to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  Second, Felder does articulate a legitimate reason for requesting this information: to help ascertain whether these individuals, who "were involved in the planning and approving of the Event and supervised individuals who attended those Events," are comparators.  (Dkt. No. 29 at 2).  Accordingly, WBD must produce documents reflecting job descriptions for each identified individual, to the extent not already produced.

## B. Individuals Identified by Felder as Comparators

### 1. Ryan Spicer

Ad Sales VP Ryan Spicer also attended the Event and, according to Felder, was not punished but instead was paid "a generous separation package after the Event." (Dkt. No. 29 at 2; *see* Compl. ¶ 94). Felder seeks Spicer's personnel file (excluding medical records) and separation benefits. (Dkt. No. 29 at 2). At the Discovery Conference, WBD conceded that Spicer is a comparator for the purposes of discovery. (Tr. at 7:3). In its supplemental letter, WBD states that it produced the requested documents. (Dkt. No. 50 at 1). Felder responds that "[t]his dispute is not resolved" because, while WBD "produced Spicer's separation agreement as part of this file, the Agreement is heavily redacted so that none of the terms and conditions are visible." (Dkt. No. 54 at 2). Felder demands that WBD produce an unredacted version, arguing that the amount of Spicer's severance is relevant to demonstrate the difference in how WBD treated Spicer and Felder. (*Id.*).

Felder does not explain how the specifics of Spicer's separation pay (or the other terms of the separation agreement) would bolster Felder's comparator evidence or why it would be insufficient for Felder to rely on the fact that Spicer received a compensation package, whereas Felder did not, to evince disparate treatment. The Court thus sides with WBD on this issue. Felder's request that WBD produce an unredacted version of Spicer's separation agreement is denied.

### 2. Jon Steinlauf

Jon Steinlauf is WBD's Chief U.S. Advertising Sales Officer and, like Felder, a longtime sales executive at the company. (Compl. ¶ 100). According to Felder, he and Steinlauf were at an event in 2009 at which Steinlauf witnessed an intoxicated account executive throw a punch at another employee. (*Id.*). Felder claims that although Steinlauf failed to report this incident promptly, neither he nor the account executive was disciplined. (*Id.*; Dkt. No. 29 at 2). Felder seeks Steinlauf's personnel file (excluding medical records) and documents related to this incident. (Dkt. No. 29 at 2). WBD argues that Steinlauf is not a proper comparator because in 2009 he was employed by a predecessor to WBD twice removed, the relevant decision-makers were different, and the incident did not involve sexual harassment and occurred thirteen years before the Event. (Dkt. No. 30 at 2-3; Tr. at 9:17-10:10).

At the discovery stage, the Court agrees with Felder that the circumstances concerning the 2009 incident (as alleged) are sufficiently similar to the incident at the Event to justify treatment of Steinlauf as a potential comparator. While the age of the incident, and the fact that the company had different ownership at the time, may weaken any inference that Steinlauf is a relevant comparator, those issues go to the strength of Felder's argument and do not preclude his ability to seek discovery into the matter. *See Miller v. City Univ. of N.Y.*, No. 21 Civ. 8591 (JPO), 2023 WL 419277, at *5 (S.D.N.Y. Jan. 26, 2023) ("A more specific parsing of the ways in which other employees were or were not similarly situated to Plaintiff is a question of fact requiring discovery."); *Khazarian v. Gerald Metals, Inc.*, No. 3:16-cv-

1762 (VAB), 2017 WL 11017757, at *1 (D. Conn. Nov. 9, 2017) ("The parties may raise and address these arguments [as to whether plaintiff's claimed comparator was in fact an appropriate comparator for plaintiff] at the summary judgment stage"). Indeed, WBD acknowledges that "Plaintiff may depose Steinlauf on the alleged incident if he desires." (Dkt. No. 50 at 4 n.11). Accordingly, WBD must produce Steinlauf's personnel file (excluding medical records) and documents related to the 2009 incident.

### C. Felder's Performance

Felder seeks documents concerning his performance dated from August 1, 2020 until his firing in August 2022. (Dkt. No. 29 at 3). At the Discovery Conference, the Court directed WBD to produce documents reflecting Felder's sales targets and whether those targets were met. (Tr. at 71:1-11). The parties do not dispute that WBD complied with this directive. (Dkt. No. 50 at 2; Dkt. No. 54 at 4). Nevertheless, Plaintiff asserts that this dispute is unresolved because he has asked for the "applicable plans concerning his incentive compensation and WBD has not produced them." (Dkt. No. 54 at 4).

However, at the Discovery Conference, the Court ruled that Felder was "not entitled to" documents reflecting "how the company went about deciding what the sales target would be for a particular year." (Tr. at 71:3-6). Felder's supplemental letter does not set forth any basis for disagreeing with this determination, claim that the documents already produced may misstate what his sales targets were, or otherwise explain how the incentive compensation plans would be relevant.

Accordingly, Felder's request for additional documents concerning his performance is denied.

### D. ESI Searches

Felder requested that WBD run twelve separate ESI searches, with proposed custodians, search terms, and timeframes. (Dkt. No. 29 at Ex. B). The parties originally disputed the parameters for all but one of those searches, with WBD contesting relevance and claiming burden. (*Id*. at 3-4 & Ex. B; Dkt. No. 30 at 4). Following the additional meet-and-confer process required by the Court at the Discovery Conference, the parties resolved their dispute as to three of the proposed ESI searches, and Felder withdrew two of his proposed searches. (Dkt. No. 54 at 6 & n.20). That leaves disputes relating to seven of the searches, which the Court addresses below.

#### 1.    Searches 2, 5, and 8

The parties dispute the appropriate timeframe for Searches 2, 5, and 8, which generally relate to the Event, the Investigation, and Felder's EEOC complaint and lawsuit, respectively. Felder proposes a timeframe of June 23, 2022 to August 18, 2023 for Search 2, July 1, 2022 to August 18, 2023 for Search 5, and July 27, 2022 to August 31, 2024 for Search 8. (Dkt. Nos. 29 at 3-4 & Ex. B). WBD proposes a narrower timeframe common to all three searches: June 23, 2022 to August 22, 2022. (Dkt. No. 30 at 2, 4).

Although the Court advised WBD at the Discovery Conference that it should run hit counts if it wanted to claim that Felder's proposed ESI searches were

unreasonable (Tr. at 73:12-17), WBD did not provide hit counts for these searches until January 3, 2025. (Dkt. No. 53). In its January 3 letter, WBD shows hit counts for these three searches of 37,610 (although WBD does not specify whether this equates to 37,610 separate documents or whether this is before or after "deduping"). (*Id.*). In response, Felder has proposed more limited searches, although the Court's review of his revised proposal indicates that the modifications are quite modest. (Dkt. No. 54 at 5 & Ex. A). Felder still insists on his original timeframes. (*Id.*).

The Court agrees that Felder's proposed timeframes for these particular searches are overbroad. Felder filed his charge with the EEOC on December 13, 2022 and filed his Complaint in this action on September 26, 2023. (Compl. ¶ 13). WBD was represented by outside counsel in the EEOC inquiry and has been represented by counsel in this action. Given the relatively low likelihood that ESI searches will yield responsive nonprivileged documents following Felder's initiation of legal action, Felder's proposed timeframes—a year after his August 18, 2022 termination in the case of Searches 2 and 5, and two years after his termination in the case of Search 8—are not proportional to the needs of this case. Limiting the ESI searches in question to six months after Felder's termination (two months after he filed his EEOC complaint) better accords with the principles of Rule 26(b)(1). *See, e.g.*, *Maurer v. Sysco Albany, LLC*, No. 119 Civ. 821(TJM) (CFH), 2021 WL 2154144, at *8 (N.D.N.Y. May 27, 2021) (setting the end date of the initial ESI search for around four months after termination); *Nuskey v. Lambright*, 251 F.R.D. 3, 10 (D.D.C. 2008) (limiting discovery to six months after termination, and noting

that plaintiff's rationale that there "could be" emails concerning her termination following her EEOC and civil complaints was "too speculative to justify extending the relevant time period to the present day").  Thus, the applicable timeframe for Searches 2, 5, and 8 shall be from June 23, 2022 to February 18, 2023.

### 2. Searches 2 and 3

WBD objects to Searches 2 and 3 to the extent Felder's proposed custodians include the following six individuals: Stan Soong, Jeff Pellegrini, Jonathan LaConti, Robert Latorre, Karen Grinthal, and Scott Kohn.  (Dkt. No. 50 at 6).  Although WBD does not dispute Felder's contention that these individuals were involved in planning and approving the Event or that they would have relevant information (Dkt. No. 29 at 4; Dkt. No. 30 at 4; Dkt. No. 50 at 6), WBD argues that Felder "has not asserted that these custodians would have any unique information not captured by other communications or custodians."  (Dkt. No. 50 at 6).

As Felder points out, however, to the extent that ESI searches reveal emails from these custodians that are duplicative of emails from other custodians, the duplication can be easily eliminated through the deduping process.  (Dkt. No. 54 at 6).  And at least three of the other custodians for Searches 2 and 3 (Adria Alpert-Romm, Anna Wingert, and Kit Herrera) were Human Resources employees and presumably were not involved in planning or approving the Event.  Importantly, WBD has yet to provide any hit count for Search 3 and has not stated how many of the hits for Search 2 it reported in its January 3 letter are attributable to these six custodians.  As the Court noted at the Discovery Conference, WBD cannot object to

searches on burden grounds without substantiating its burden claim with a hit report.  *See, e.g.*, *In re Allergan PLC Sec. Litig.*, No. 18 Civ. 12089 (CM) (GWG), 2020 WL 4034751, at *1 (S.D.N.Y. Mar. 30, 2020) ("As part of the negotiation process over search terms, the defendants must provide the plaintiff with the hit counts for searches run with proposed terms—regardless of whether the defendants believe the terms are proper.").  Thus, WBD has failed to substantiate its burden claim with respect to the inclusion of the six custodians for Searches 2 and 3 and its objection is overruled.[3]

### 3.  Search 1

Search 1 seeks ESI mentioning Felder by name from central actors during the period between late June 2022 and August 18, 2023, including Felder's supervisors Michelle Kornett and Greg Regis; the HR personnel involved in the Investigation and Felder's firing, including Adria Alpert-Romm, Anna Wingert, Kit Herrera; and Felder's long-time mentor and head of Ad Sales, Jon Steinlauf.  (Dkt. No. 29 at 4).  This search specifically excludes communications on which Felder is copied.  (*Id.*).

WBD has expressed concern that Felder's proposed search terms for Search 1, which include "matthew" as well as "matt" are overly broad and will sweep in

---

[3] WBD's reliance on cases finding that a party had not shown the proposed additional custodians had "unique relevant information not already obtained" (Dkt. No. 50 at 6) is misplaced.  (See Dkt. No. 50 at 6 (citing *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 104 (S.D.N.Y. 2013), and *Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*, No. 18 Civ. 10364, 2021 WL 5299238, at *1 (S.D.N.Y. Oct. 18, 2021)).  As Felder notes, in those cases, the party from whom the discovery was sought had already produced a considerable volume of documents (over 100,000 in *Fort Worth*, over 1 million pages in *Allianz Glob.*), so the concerns over duplication and burden were significantly greater.  (Dkt. No. 54 at 5 n.18).

communications relating to individuals other than Felder.  At the Discovery

Conference, the Court indicated that it shared that concern and stated, "[P]laintiff

is entitled to a reasonable search for e-mails for th[e] six people referencing . . .

Felder, after he was fired" and that "if the search terms hit on too many documents,

[counsel] should go back to the drawing board and try to do something new and

improved." (Tr. at 76:25-78:9).  WBD represents that the hit count for Search 1 is

77,034.  (Dkt. No. 53).  Felder agrees that the search should be narrowed in light of

this hit count.  (Dkt. No. 54 at 6).  Felder has proposed revised search terms and

asks that WBD provide hit counts for his revised search terms, along with a hit

report in case the hit count remains high so that Felder can address the terms

generating the most hit counts.  (*Id*.).  The Court agrees and directs WBD to rerun

the hit count for Search 1 based on Felder's revised search terms and provide Felder

with a hit report if it believes the hit count is still too high.  The parties must then

meet and confer with a view to identifying mutually acceptable search terms and

parameters.

### 4.  Searches 9 and 10

Searches 9 and 10 seek comparator information in which key decisionmakers

consider firing other employees (Search 9) or similar misconduct (Search 10).  (Dkt.

No. 29 at 4).  WBD has provided hit counts for these searches (Dkt. No. 53), and

they are indeed overly broad (295,607 and 38,232, respectively).  *See Kairam v. W.*

*Side GI, LLC*, No. 118 Civ. 01005 (AT) (SDA), 2023 WL 3220159, at *2 (S.D.N.Y.

Feb. 24, 2023) ("Here, many of the search terms sought by Plaintiff are non-specific

and not proportional to the needs of the case, particularly considering the high hit counts.").  In response, Felder has offered to narrow these searches.  (Dkt. No. 54 at 6).

While this narrowing may mitigate WBD's burden concerns, should these narrowed searches prove not to be mutually acceptable, the parties are directed to meet and confer with a view to identifying mutually acceptable search terms and parameters.

### E.  Internal Investigation Materials

Felder moves to compel WBD to produce documents relating to WBD's internal investigation of the complaints that led to Felder's firing.  (Dkt. No. 33). WBD opposes the motion, asserting that these materials are protected by the attorney-client privilege and work product doctrine.  (Dkt. No. 34).  Felder argues that these documents are not privileged and, even if they are, WBD has waived the privilege by placing the Investigation "at issue" and/or selectively disclosing information from the Investigation in its position statement filed with the EEOC. (Dkt. Nos. 33, 44).  WBD disagrees with each of these assertions.  (Dkt. Nos. 34, 45).

The scope of this dispute has been narrowed in certain respects.  Felder states that he "does not seek any materials consisting of attorney opinion work product" and instead seeks only "all documents comprising the factual portions of the investigation."  (Dkt. No. 44 at 1 n.5).  For its part, WBD represents that it has produced "every underlying document" from the Investigation, such as a photograph of the client-representative during the Event and receipts relating to the purchase

of alcohol for the Event. (Tr. at 86:13-23). WBD also represents that the
Investigation did not culminate in a written report or with written talking points
used to debrief WBD managers about its findings. (*Id.* at 87:6-19).

This still leaves a considerable volume of documents in controversy. WBD
has provided the Court with its privilege log, which contains more than 125
separate entries spanning 29 pages. For each entry, the privilege log cites WBD's
"internal investigation" as the reason for its invocation of attorney-client and
attorney work product privileges. At least 21 of the listed documents consist of
interview notes from interviews conducted during the Investigation. WBD has
declined to produce the interview notes or any summaries of the statements made
by witnesses during the Investigation. (Tr. 86:4-87:5).

### 1.    Applicability of Privilege

The Court must first decide whether the relevant materials are protected by
the attorney-client privilege and/or work product doctrine. WBD contends that both
apply. (Dkt. No. 34 at 1-2). Felder argues that the materials are not privileged or
protected by the work product doctrine because the Investigation was conducted
"pursuant to [WBD's] internal policies and for business purposes." (Dkt. No. 33 at
1).

The attorney-client privilege protects from disclosure "(1) a communication
between client and counsel that (2) was intended to be and was in fact kept
confidential, and (3) was made for the purpose of obtaining or providing legal
advice." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). "The privilege

protects both the advice of the attorney to the client and the information communicated by the client that provides a basis for giving advice." *Johnson v. J. Walter Thompson U.S.A., LLC*, No. 16 Civ. 1805 (JPO) (JCF), 2017 WL 3432301, at *2 (S.D.N.Y. Aug. 9, 2017). "'[I]nterviews of a corporation's employees by its attorneys as part of an internal investigation into wrongdoing and potentially illegal conduct have been repeatedly found to be protected by the attorney-client privilege.'" *Id.* at *3 (quoting *Gruss v. Zwirn*, 276 F.R.D. 115, 124 (S.D.N.Y. 2011), *rev'd in part on other grounds*, No. 09 Civ. 6441, 2013 WL 3481350 (S.D.N.Y. July 10, 2013)).

The attorney work-product doctrine protects from disclosure "materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need." *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995) (quoting Fed. R. Civ. P. 26(b)(3)). "'[T]hree conditions must be fulfilled in order for work product protection to apply. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative.'" *Johnson*, 2017 WL 3432301, at *5 (citation omitted). Thus, materials produced in connection with an internal investigation "may be protected under the work product doctrine if the investigation was conducted in anticipation of litigation." *Farzan v. Wells Fargo Bank*, No. 12 Civ. 1217 (RJS) (JLC), 2012 WL 6763570, at *2 (S.D.N.Y. Dec. 28, 2012).

Here, both the attorney-client privilege and work product doctrine apply to WBD's Investigation materials.  First, WBD has represented that the Investigation was directed and overseen by its in-house legal counsel for the purpose of providing legal advice to the company concerning its potential legal risks.  (Dkt. No. 34 at 2; Tr. at 90:9-17).  The privilege log submitted by WBD confirms the involvement of counsel beginning as early as the evening of August 1, 2022 (the date the incident was first reported by Felder and WBD's client) and continuing throughout the Investigation.  (*See also* Tr. 90:13-16 (WBD's counsel stating that "the moment WBD became aware of what happened at the event, . . . [c]ounsel was all over this")).  Thus, the attorney-client privilege attaches to the Investigation, even though some (and, it appears from the privilege log, most) of the interviews were conducted by non-lawyers, acting at the direction of counsel.  (Tr. at 89:14-19).  *See, e.g.*, *Farzan*, 2012 WL 6763570, at *1 ("[I]t is well-settled that '[f]actual investigations conducted by an agent of the attorney, such as gathering statements from employees, clearly fall within the attorney-client rubric.'" (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 71 (S.D.N.Y. 2010)) (cleaned up)).

Second, WBD would have reasonably anticipated litigation at the time of the Investigation.  The incident under investigation involved allegations of (as characterized by Felder) "sexual harassment" and "sexual misconduct" at a WBD-sponsored event where an intoxicated male WBD employee may have inappropriately touched an intoxicated female WBD client representative.  (Compl. ¶¶ 53, 57 and pp. 7 & 10 (section headings)).  The client company, according to

WBD, was "'very upset about the incident and wanted to ensure that it was properly investigated.'"  (Dkt. No. 33 at 2) (citation omitted).  At a minimum, WBD had reason to fear a possible lawsuit from the alleged victim of the sexual harassment or even litigation with its client (as well as possible regulatory involvement).  Felder's counsel acknowledged as much at the Discovery Conference.  (Tr. at 94:3-9 ("[I]t is a possibility, yes. I can't dispute that in good faith.")).  Under these circumstances, the attorney work-product doctrine also attaches.  *See, e.g.*, *Farzan*, 2012 WL 6763570, at *2 (internal investigation materials protected by attorney work-product doctrine where employer "justifiably anticipated litigation" at time of investigation).

Felder's counterarguments are unavailing.  Felder argues that under WBD's policies, "all discrimination complaints must be thoroughly investigated" and thus the Investigation would have occurred for business reasons regardless of any legal concerns.  (Dkt. No. 33 at 1-2).  But as courts have held in rejecting similar arguments, "the purpose of a communication need not be exclusively legal in order for the [attorney-client] privilege to attach." *Johnson*, 2017 WL 3432301, at *3; *see also In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014) ("In the context of an organization's internal investigation, if one of the significant purposes of the internal investigation was to obtain or provide legal advice, the privilege will apply. That is true regardless of whether an internal investigation was . . . conducted pursuant to company policy.").  Similarly, "even where a business . . . has a policy of conducting such investigations, the circumstances of a particular investigation" may indicate that the investigation is related to reasonably

31

anticipated litigation, triggering work product protection. *Johnson*, 2017 WL 3432301, at *6 (fact that employer had "a written policy for investigating discrimination complaints" did not deprive investigation materials of work product protection). As WBD argues, the particular Investigation here "immediately adopted a legal character because of the specific issues involved." (Dkt. No. 34 at 2).

Felder also argues that WBD's "chief concern" was preserving its relationship with its client, which in Felder's view "undercuts [WBD's] argument that the investigation was for legal purposes." (Dkt. No. 33 at 2). But the fact that a company may have had "multiple motivations" for conducting an internal investigation, some business-related, does not defeat the privilege. *Johnson*, 2017 WL 3432301, at *3. "Rare is the case that a troubled corporation will initiate an internal investigation solely for legal, rather than business, purposes," and where the provision of legal advice was a "primary purpose" of the investigation, the privilege applies. *In re Gen. Mot. LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 530 (S.D.N.Y. 2015); *see also United States v. Mount Sinai Hosp.*, 185 F. Supp. 3d 383, 389-90 (S.D.N.Y. 2016) (party invoking attorney-client privilege "need only show that the provision of legal advice was a 'primary purpose' of the investigation and of the communications as to which the privilege is claimed"). That WBD's client was "very upset" and demanding action (Dkt. No. 33 at 2) only strengthens

rather than weakens WBD's claim that the assistance and advice of counsel was needed in connection with the Investigation.[4]

Thus, even though the Investigation may have been conducted in part for business-related reasons, the Court agrees with WBD that a primary purpose of the Investigation was related to the need for legal advice and that WBD reasonably anticipated possible litigation which might arise out of the Event. Accordingly, the Court finds that the Investigation materials are protected by both the attorney-client privilege and the work product doctrine.

### 2.    At-Issue Waiver

Both attorney-client privilege and work product protection can be waived where a party places privileged communications "at issue." *Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*, No. 18 Civ. 4921 (PGG) (KHP), 2021 WL 1930294, at *2 (S.D.N.Y. May 13, 2021). "The at-issue waiver rule aims to prevent the unfairness that results 'when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'" *Abromavage v. Deutsche Bank Secs. Inc.*, No. 18 Civ. 6621 (VEC), 2019 WL 6790513, at *2 (S.D.N.Y. Dec. 11, 2019) (quoting *In re Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008)). "'A party cannot partially disclose privileged

---

[4] Felder relies on *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 106 (S.D.N.Y. 2007), for the proposition that "work product protection is not available for documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation." (Dkt. No. 33 at 2 n.6). But that case involved unusual facts—among other things, the investigation was led by a non-lawyer and there was no showing that it was conducted under the direction of counsel or included the provision of legal advice, *see Allied Irish Banks*, 240 F.R.D. at 100-02—and has repeatedly been distinguished from the type of investigation involved in this case. *See, e.g.*, *In re Gen. Mot.*, 80 F. Supp. 3d at 531; *Gruss*, 276 F.R.D. at 128-29.

communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.'" *Barbini v. First Niagara Bank, N.A.*, 331 F.R.D. 454, 460 (S.D.N.Y. 2019) (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000)).  However, "simply because privileged information is relevant to a claim or defense in the case does not give rise to an implied waiver; rather, to forfeit privilege, 'the party must rely on privileged . . . [information] to make his claim or defense.'" *Leviton Mfg. Co. v. Greenberg Traurig LLP*, No. 09 Civ. 8083 (GBD) (THK), 2010 WL 4983183, at *4 (S.D.N.Y. Dec. 6, 2010) (quoting *In re Cnty. of Erie*, 546 F.3d at 229); *see also Johnson*, 2017 WL 3432301, at *7 ("the fact that a privileged communication may merely be relevant to a claim or defense is insufficient to forfeit protection").

One way in which a litigant may place privileged communications at issue is by relying on a claim or defense that it acted in good faith.  "[T]he assertion of a good-faith defense involves an inquiry into state of mind, which typically calls forth the possibility of implied waiver of the attorney-client privilege." *In re Cnty. of Erie*, 546 F.3d at 228-29.  "[W]hen a party asserts a good faith defense, . . . it may not selectively proffer the information upon which it relied." *Johnson*, 2017 WL 3432301, at *8; *see also Scott v. Chipotle Mexican Grill, Inc.*, 67 F. Supp. 3d 607, 611 (S.D.N.Y. 2014) ("[I]f (1) a defendant claims the defense of good faith, and (2) that claim can only be scrutinized by examining the disputed communications, then that defendant has waived the privilege.").  "The rationale underlying this waiver

34

principle is that 'it would be unfair for a party asserting contentions [of good faith] to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions.'" *Sec. & Exch. Comm'n v. Honig*, No. 18 Civ. 8175 (ER), 2021 WL 5630804, at *11 (S.D.N.Y. Nov. 30, 2021) (quoting *Arista Recs. LLC v. Lime Grp. LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 1642434, at *3 (S.D.N.Y. Apr. 20, 2011)).

The mere assertion of a good faith defense does not waive privilege; rather, "[f]orfeiture of this type is premised on the *unfairness* to the adversary of *having to defend* against the privilege holder's claim without access to pertinent privileged materials that might refute the claim." *John Doe Co. v. United States*, 350 F.3d 299, 304 (2d Cir. 2003) (emphasis in original). Where "there is no unfairness" because the adversary is "'in no way worse off' as a result of the disclosure that [privileged] communications exist than they would be if they were unaware of them," no waiver is implied. *In re Cnty. of Erie*, 546 F.3d at 229 (quoting *John Doe Co.*, 350 F.3d at 305). "The paramount consideration is '[w]hether fairness requires disclosure,' which must be determined 'on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted.'" *Johnson*, 2017 WL 3432301, at *7 (quoting *In re Grand Jury Proceedings*, 219 F.3d at 183).

In his original motion, Felder argued that WBD waived privilege by asserting affirmative defenses in its Answer that invoke the so-called *Faragher/Ellerth* defense. (Dkt. No. 33 at 2 & nn.7-8 (citing WBS's eighth and tenth affirmative defenses)). The *Faragher/Ellerth* doctrine allows an employer to "escape liability

by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). It is true that "'[w]hen an employer puts the reasonableness of an internal investigation at issue by asserting the *Faragher/Ellerth* defense, the employer waives any privilege that might otherwise apply to documents concerning that investigation.'" *Robinson v. Vineyard Vines, LLC*, No. 15 Civ. 4972 (VB) (JCM), 2016 WL 845283, at *4 (S.D.N.Y. Mar. 4, 2016) (quoting *Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 41 (E.D.N.Y. 2013), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014)).

It is equally true, however, that if an employer "decides to drop the asserted defense, there will of course no longer be any basis for implying a waiver." *Id.* at *4 (cleaned up). And that is what WBD has done. At the Discovery Conference, WBD's counsel represented that WBD would not be relying on this defense (Tr. at 104:25-105:1-9), and then, in its supplemental letter-brief on this issue, WBD "confirm[ed] that it does not intend to rely on the internal investigation as a defense to the Plaintiff's allegations in this action and waives reliance on the eighth and tenth defenses contained in its Answer" (Dkt. No. 45 at 3). Felder's counsel acknowledges that WBD can do this. (Tr. at 110:17-18 ("I do agree the case law allows them to withdraw or say they won't raise it.")). Thus, this waiver argument by Felder fails. *See Robinson*, 2016 WL 845283, at *5 (finding no waiver where,

even though defendants appeared to assert a *Faragher/Ellerth* defense in their answer, they later "affirmatively represented on the record at the . . . conference and in their letters to the Court that they are not asserting the reasonableness of any investigation as a defense in this litigation"); *Johnson*, 2017 WL 3432301, at *8 (rejecting waiver argument where defendants "have since disavowed use of the [investigation report] in connection with any *Farragher/Ellerth* defense").

Felder, however, advances another at-issue waiver argument: that WBD has waived privilege through its reliance on the Investigation, including statements made by Felder and other witnesses to WBD's investigators, to justify Felder's firing. (Dkt. No. 33 at 2-3). According to Felder, WBD in substance asserts that the Investigation supplies "the basis for [its] decision" to fire Felder and its "supposed legitimate, non-retaliatory reason for taking the steps that they did[.]" (Tr. at 111:5-9; *see* Dkt. No. 10 at 15 (Fourth Defense) (WBD's Answer asserting as an affirmative defense that its employment actions were based on "legitimate, non-retaliatory factors")). "[I]f the key is what's in the decision-maker's head," and "everything in her head is based on the investigation," Felder reasons, then WBD has put "at issue" documents reflecting the facts upon which the decision-maker relied. (Tr. at 108:23-109:2; *see* Dkt. No. 33 at 2-3).

As an example of how WBD has put the Investigation at issue (*see* Tr. at 113:13-15), Felder cites WBD's April 21, 2023 position statement submitted to the EEOC ("Position Statement"), which WBD has also produced in this litigation. (Dkt. No. 33 at 2-3 & n.9). In urging the EEOC to reject Felder's unlawful

retaliation complaint, WBD's Position Statement highlighted its "prompt and thorough investigation of the incident," which "took about three weeks and included interviews of ten WBD employees and multiple other witness interviews." (*Id.* at n.9 (quoting Position Statement)).  To support WBD's argument that Felder was properly terminated based on his own misconduct, the Position Statement describes numerous statements made to WBD's investigators by Felder (*e.g.*, that Felder "admitted" or "said" or "claimed" certain things) and by other witnesses (*e.g.*, that "several witnesses reported" certain facts).  (*Id.* at 2-3 n.9).

WBD has made plain that it intends to continue to use the factual content of the Investigation in this way in litigating this action.  Asked at the Discovery Conference what use, if any, WBD intended to make of the Investigation in this case, counsel responded that she "can imagine the decision-maker" testifying about her understanding of the outcome of the Investigation based on "[t]he facts that were uncovered from the investigation."  (Tr. at 105:17-106:15; *see also* Dkt. No. 34 at 3 (stating that "WBD intends to use facts that it learned from the investigation and relied upon in deciding to terminate Plaintiff as part of its defense")).  Those "facts," of course, include not only the documents considered during the Investigation—which WBD has produced to Felder (Tr. at 86:13-23)—but also, and importantly, the witness statements, which it has not.  WBD's position is that Felder is not allowed discovery of the statements made by witnesses during the Investigation; according to WBD, not only are the interview notes or summaries of the interviews privileged, but so too would be testimony about what the witnesses

said during the interviews. (*See* Tr. at 103:22-104:19 (WBD counsel taking the position that WBD would not allow either WBD's investigators or the witnesses to testify at a deposition in this case about what a witness told the investigators)).

In lieu of such discovery, WBD proposes that the witnesses can be deposed and can be asked about what they observed and what occurred. (Dkt. No. 45 at 3; *see* Tr. at 104:3-10). At the same time, however, WBD states that such depositions are "unnecessary" because "it is only what was in the mind of the decision maker, [Adria Alpert Romm], at the time she made the decision to terminate Felder, that is relevant. Litigating whether Plaintiff's misconduct actually occurred or if Ms. Alpert Room incorrectly believed it occurred, is not relevant to this action." (Dkt. No. 45 at 3 n.2 (citing *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006), for the proposition that in a discrimination case "we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer.")); *see also* Tr. at 104:7-9, 107:5-108:1). In other words, WBD acknowledges that what is relevant is not the witnesses' deposition testimony about what actually happened, but their statements to WBD's investigators during the Investigation, which is the information that was "in the mind of the decisionmaker" at the time Felder was fired. Yet, paradoxically, that is precisely the information that WBD claims Felder cannot have access to.

This is not a paradox that the law accommodates. As noted above, a party "cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the

underlying communications from scrutiny by the opposing party." *In re Grand Jury Proceedings*, 219 F.3d at 182. That is what WBD is attempting to do in this case: it is (1) partially disclosing and affirmatively relying on the privileged communications concerning its interviews during the Investigation to assert that it justifiably terminated Felder, yet simultaneously (2) denying Felder access to the full communications so he can test whether WBD's characterization of the interviews is truthful. The waiver doctrine prevents such selective use of privileged information as both a "sword" and a "shield." *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword.").

This is not to say that any time a litigant makes factual assertions based on an internal investigation, it has put those facts "at issue" and waived privilege. That is not the law. In most cases, the disputed facts can be determined based on non-privileged evidence, including witness testimony at depositions and trial. In this employment retaliation case, however, WBD is asserting a defense based on its alleged good faith belief that Felder had engaged in misconduct warranting his termination. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001) (noting that it is lawful for "an employer to select for termination an employee who the employer in good faith believes recently engaged in fraud relating to the employment[,] [w]hether or not fraud actually occurred"); *Gokhberg v. PNC Bank, N.A.*, No. 17 Civ. 276 (DLI) (VMS), 2021 WL 421993, at *7 (E.D.N.Y. Jan. 6, 2021) ("An employer's good faith belief that an employee has engaged in misconduct is a

legitimate reason to terminate the employee."). WBD acknowledges that in showing its good faith, it will be affirmatively relying on what Felder and other witnesses told its investigators during the Investigation, and it has already partially disclosed the witnesses' statements. Under these circumstances, it would be intolerably unfair to deny Felder access to the witness statements (including his own) and thus deprive him of the ability to rebut WBD's good faith defense by showing that, when considered in full, and not just on the basis of WBD's selective self-interested culling, the witness statements do not support WBD's characterization.

Courts have repeatedly found waiver of the attorney-client privilege and work product doctrine in similar contexts in employment cases. *See, e.g.*, *Leccese v. Sharestates, Inc.*, No. 24 Civ. 1060 (JHR) (SLC), 2025 WL 1380064, at *6 (S.D.N.Y. May 13, 2025) (ordering employer to disclose documents that "contain the substance of other employees' complaints about [plaintiff] on which [defendant] predicated termination of his employment for cause," despite employer's privilege claim); *Brownell v. Roadway Package Sys., Inc.*, 185 F.R.D. 19, 25-26 (N.D.N.Y. 1999) (ordering employer to disclose witness statements obtained by attorney in course of internal investigation in case alleging discrimination and retaliation by former employee who was terminated after reporting sexual harassment); *Bean v. Wyoming Seminary of Susquehanna Annual Conf.*, No. 23 Civ. 1702, 2024 WL 1197521, at *3, *6 (M.D. Pa. Mar. 20, 2004) (finding at-issue waiver and ordering production of, *inter alia*, outside counsel's interview summaries and interview notes where "outside counsel's investigation will be used to further [the employer's]

41

defense that it had a legitimate, non-discriminatory reason in terminating plaintiff

and that she was not otherwise discriminated or retaliated against"); *Carpenter v.*

*Mohawk Industries, Inc.*, No. 07 Civ. 0049 (HLM), 2007 WL 5971741, at *13 (N.D.

Ga. Oct. 1, 2007) (concluding that employer "has waived the attorney-client

privilege with respect to the communications relating to the interview of Plaintiff

and the decision to terminate Plaintiff's employment" and ordering production of

attorney's notes of interview); *Rivera v. Kmart Corp.*, 190 F.R.D. 298, 303-04 (D.P.R.

2000) (finding that employer waived privilege as to interview with its store manager

by arguing that interview supported its decision to fire plaintiffs based on their

alleged misconduct, as defense to plaintiffs' claims they were retaliated against for

reporting supervisors' misconduct to authorities); *Fultz v. Federal Sign*, No. 94 Civ.

1931, 1995 WL 76874, at *2 (N.D. Ill. Feb. 17, 1995) ("[I]f the investigation or its

results is to be used as evidence at trial, then clearly the privilege which it enjoys

would be waived. One cannot assert the attorney/client privilege to keep an

opponent from discovering facts about an investigation when the investigation is to

be used at trial as a defense to defeat the opponent's allegations.").[5]

---

[5] Indeed, in some cases the employer turns over these factual materials voluntarily with no need for the plaintiff to compel their production. *See, e.g.*, *Abromavage*, 2019 WL 6790513, at *2 (noting that, "[d]uring discovery, [the employer] produced the interview notes taken by its [in-house attorney and head of human resources]" during internal investigation); *Pray v. N.Y.C. Ballet Co.*, No. 96 Civ. 5723 (RCL) (HBP), 1997 WL 266980, at *2 (S.D.N.Y. May 19, 1997) ("both parties agree that plaintiffs are entitle[d] to depose the attorneys on what actually occurred during the investigations"), *aff'd*, 1998 WL 558796 (S.D.N.Y. Feb. 13, 1998); *see also* Nancy L. Abell, *Conducting an Effective Workplace Investigation*, VLR 994 A.L.I.-A.B.A. 459, 470 (Sept. 14, 1999), available in Westlaw at VLR 994-ALI-ABA 459 ("If a terminated employee challenges his or her discharge, the defendant employer likewise often will find it necessary to waive the privilege to establish good cause or a legitimate nondiscriminatory reason for its decision. Accordingly, the employer may need to disclose [*inter alia*]

WBD's cases do not support a contrary result.  (*See* Dkt. No. 34 at 2-3; Dkt. No. 45 at 3).  In *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482 (S.D.N.Y. 2019), the terminated plaintiff, Barnes & Noble's former CEO, was suing for breach of contract and defamation, not for employment discrimination or retaliation.  *Id*. at 484.  In finding there had been no at issue waiver, the court reasoned that whether Barnes & Noble acted in a "grossly irresponsible manner," as required for plaintiff's defamation claim, "must be proven by [plaintiff] and can be shown by him exclusively through objective proof."  *Id*. at 502.  Here, by contrast, WBD not only acknowledges but affirmatively argues that the question of whether it fired Felder for legitimate, non-retaliatory reasons depends on the subjective beliefs and motivations of its decisionmaker, not objective proof.  (Dkt. No. 45 at 3 n.2; Tr. at 104:7-9, 107:5-108:1).

Similarly, in support of its argument that Felder can depose the witnesses who were interviewed during the Investigation, WBD cites *Costabile v. Westchester, N.Y.*, 254 F.R.D. 160, 167 (S.D.N.Y. 2008) ("Defendants make no argument that these employees are now unavailable to be interviewed or deposed, and therefore have not established that the report is discoverable.").  *Costabile* was indeed an employment discrimination case, but there, it was the defendant-*employer* who was seeking a privileged report prepared by the plaintiff-*employee*'s private investigator.  *Id*. at 162-63.  Unlike here, the plaintiff's subjective motivation based on his private

---

the investigation process, the notes and the investigative report . . ., even if such information constitutes or contains privileged communications or work-product.").

investigator's report was not at issue, and the plaintiff was not relying on the
investigation "to disclose some selected communications or documents for self-
serving purposes." *Id.* at 167.

Under the circumstances of this case, the Court concludes that through its
affirmative reliance on assertedly privileged communications, *i.e.*, the statements by
witnesses to WBD's investigators, WBD has placed this information at issue and
thus has waived privilege and work product protection as to that information.

### 3.    Selective Disclosure

Felder argues further that WBD waived any applicable privilege through its
disclosure of information in its Position Statement submitted to the EEOC and
produced to Felder in this action.  (Dkt. No. 44 at 1-2).  Felder asserts that WBD's
Position Statement "relied heavily on its investigation as a defense to Felder's
claims and characterized several statements Felder and other witnesses
purportedly made during interviews conducted as part of the investigation" and, as
a result, WBD has waived any relevant privilege as to interview memoranda and
summaries from which this content was drawn.  (Dkt. No. 44 at 1).

The Court finds Felder's selective disclosure waiver argument persuasive as
well.  "As a general matter, when a party selectively discloses attorney-client
communications to an adverse government entity, the privilege is waived not only
as to the materials provided, but also as to the underlying source materials." *Gruss*
*v. Zwirn*, No. 09 Civ. 6441, 2013 WL 3481350, at *12 (S.D.N.Y. July 10, 2013).
Likewise, "waiver of work product protection can occur where a party discloses the

substance of attorney work product to a government entity." *Id.*; *see In re*
*Steinhardt Partners, L.P.*, 9 F.3d 230 (2d Cir. 1993) (party's voluntary disclosure of
privileged information in submission to SEC waived attorney-client privilege and
work product protection in subsequent class action arising from same facts). "The
selective disclosure waiver doctrine is reflected in Rule 502(a) of the Federal Rules
of Evidence." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 17 F. Supp. 3d 400,
405 (S.D.N.Y. 2014); *see* Fed. R. Evid. 502(a) (describing circumstances under which
disclosure of privileged information "in a federal proceeding or to a federal office or
agency" waives protection as to undisclosed communications).

WBD argues that simply referencing the "conclusions" of an internal
investigation or providing a "general summary of the facts" in a submission to an
adverse government entity does not constitute a waiver. (Dkt. No. 34 at 2-3; Dkt.
No. 45 at 2). But WBD's Position Statement goes well beyond this. The Position
Statement includes numerous disclosures of specific statements purportedly made
by Felder and other witnesses to WBD's investigators—the very communications
that WBD contends are privileged. For example, it discloses that Felder
"admi[tted]" that M.S.'s "behavior was 'creepy'"; that he "admitted during the
investigation of this incident that he should have removed [M.S.] from the event";
that he "said" that "he would not characterize [M.S.'s] behavior as 'predatory,'"; and
that, when asked why he did not report the incident sooner, Felder "claimed" he did
not want "to bother his supervisor on a 'Summer Friday.'" (Dkt. No. 33 at 2 n.9).
The Position Statement also discloses that "several witnesses reported that" Felder

was involved in helping the female client-representative, "making him the face of WBD's on-the-scene response," and Felder's response "was clearly inadequate." (*Id.* at 3 n.9).

Courts have found waiver under similar circumstances. In *Gruss v. Zwirn*, for example, the court held that because "[e]xcerpts of Defendants' attorneys' work product—the interview notes and summaries—were deliberately, voluntarily, and selectively disclosed to the SEC" in defendants' SEC presentation, "any work product protection associated with the factual portions of the interview notes and summaries was forfeited." *Gruss*, 2013 WL 3481350, at *13. Similarly, in *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459 (S.D.N.Y. 1996), the court found that the inclusion of excerpts of witness interviews conducted during an internal investigation in a submission to the SEC, meant to persuade the SEC that the wrongdoing at issue was the work of one rogue employee, "suffices to waive any privilege" to the underlying interview notes and summaries. *Id.* at 472.

WBD contends that the Position Statement does not "contain any direct reference to or disclosure of the underlying investigation notes and advice that were generated by or at the direction of WBD's in-house counsel." (Dkt. No. 45 at 2). The absence of any reference in the Position Statement to counsel's legal advice is irrelevant, as Felder does not seek discovery of such advice. Nor is it necessary for WBD to have "directly" referenced or disclosed the Investigation notes for it to have waived protection for those notes. The courts in both *Gruss* and *Kidder Peabody* required disclosure of underlying interview notes and summaries based on the

companies' disclosure of the substance of statements of the witnesses. Under Fed. R. Evid. 502(a), a waiver of privileged information "extends to an undisclosed communication or information" if "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." Those requirements are all satisfied here. *See* Fed. R. Evid. 502(a), Advisory Notes ("Under [Rule 502(a)], a party that makes a selective, misleading presentation that is unfair to the adversary opens itself to a more complete and accurate presentation.").

Here again, WBD's authorities are unavailing. (*See* Dkt. No. 45 at 2). WBD cites *Costabile v. Cnty. of Westchester*, where the court rejected the employer's argument that the plaintiff-employee had waived privilege by disclosing his investigator's report to the EEOC. 254 F.R.D. at 164-66. But the court rejected that argument on the ground that the EEOC, as the government agency charged with enforcing federal employment discrimination laws, "was certainly not in an adversarial position with respect to plaintiffs." *Id*. at 166. Here, there is no question that the EEOC was adverse with respect to WBD in connection with the EEOC's investigation of Felder's complaint. WBD also cites *In re Woolworth Corp. Sec. Class Action Litig.*, No. 94 Civ. 2217 (RO), 1996 WL 306576 (S.D.N.Y. June 7, 1996), where the court, in rejecting a waiver argument, noted that "[t]he privilege protects communications between attorney and client, not the underlying relevant facts upon which those communications were based." *Id*. at *2. Here, however, WBS has disclosed the purportedly privileged communications themselves, by

describing what witnesses "admitted," "said," "claimed," and "reported" to WBD's investigators. (Dkt. No. 33 at 2 n.9).[6]

The Court thus concludes that WBD also has waived privilege and work product protection as to the investigation notes or summaries of witness statements by selectively disclosing witness statements in its EEOC Position Statement.

### 4. Scope of Waiver

Based on the analysis above, WBD must produce any notes or summaries of interviews conducted during the Investigation. This would include, at a minimum, the relevant portions of the following documents identified on its Privilege Log: Nos. 28, 37-39, 52, 110-125 (all labeled "Investigation interview notes").

WBD must also produce any statements of the underlying facts made by Felder or other witnesses contained in emails or other documents sent by these individuals during the Investigation. For example, Document Nos. 68 and 82 on the Privilege Log are described as messages sent by Felder and these should be produced to the extent they contain factual information related to the Investigation.

Finally, WBD must also produce documents reflecting factual findings or summaries of the factual findings of the Investigation. An example of such a document on WBD's Privilege Log is No. 46, labeled "Internal Witness Log" and

---

[6] In *Robinson v. Vineyard Vines*, the court rejected a plaintiff's cursorily-made argument that the employer had waived privilege as to investigation documents through its position statement to the EEOC. 2016 WL 845283, at *5 n.8. In that case, however, the plaintiff made no claim or showing that the employer had disclosed privileged communications in its EEOC submission. *See id.* & Joint Letter, Dkt. No. 27 at 3 (Dec. 7, 2015). Moreover, the investigation took place after plaintiff's employment and the employer was not relying on it to justify plaintiff's termination or in support of a contention that it had legitimate, nondiscriminatory reasons for its employment actions. *See* 2016 WL 845283, at *2, *5; Dkt. No. 27 at 3.

described as a document "created by investigators summarizing some factual findings."

However, WBD need not produce any legal advice or theories, opinion work product, or mental impressions or conclusions of an attorney reflected in these documents. Such information, if any, may be redacted from the documents.

### F. Depositions of WBD Executives

WBD seeks a protective order to prohibit Felder from deposing three WBD executives: (1) Jon Steinlauf, WBD's Chief U.S. Advertising Sales Officer; (2) Kit Herrera, WBD's Senior VP of People & Culture; and (3) Michele Kornett, WBD's Senior VP of Ad Sales. (Dkt. No. 36). WBD argues that all three individuals are protected from deposition under the apex doctrine, which generally serves to prohibit the depositions of high-level executives absent a requisite showing of need. (*Id.*).

As noted above, the apex doctrine generally safeguards highly-placed corporate executives from depositions absent a showing that the witness possesses "unique evidence [or] personal knowledge of the claims at issue, or… other witnesses are incapable of providing testimony about the conduct alleged." *Iowa Pub. Employees' Ret. Sys.*, 2020 WL 6273396, at *1. In evaluating whether the apex doctrine applies, courts consider "the likelihood that the individual possesses relevant knowledge, whether another source could provide identical information, the possibility of harassment, and the potential disruption of business." *Scott*, 306 F.R.D. at 122.

While the apex doctrine provides an "additional layer of protection for senior corporate executives subject to depositions," *id*. (citation omitted), "senior executives are not exempt from deposition, and, because principles relating to apex witnesses are in tension with the broad availability of discovery, it is important to excuse a witness from giving testimony only in compelling circumstances," *Chevron Corp. v. Donziger*, No. 11 Civ. 691 (LAK) (JCF), 2013 WL 1896932, at *1 (S.D.N.Y. May 7, 2013) (citation omitted).[7]

### 1. Jon Steinlauf

WBD argues that Steinlauf's executive position warrants application of the apex doctrine to bar his deposition because he has no personal or unique knowledge of the Event or Felder's termination. (Dkt. No 36 at 2). As WBD explains, Steinlauf did not attend the Event, had no communication with Felder about his incident report, and was not the decision-maker for Felder's termination. (*Id*.). WBD argues further (as noted above) that the 2009 incident, in which Steinlauf allegedly witnessed an employee throw a punch at another employee, is not relevant. (*Id*.). WBD concludes that because of the significant disruption such a deposition would cause, it should be barred. (*Id*.).

Felder replies that Steinlauf has personal knowledge of, *inter alia*, "Felder's performance; Felder's internal complaints regarding the Event; WBD's August 2,

---

[7] Felder disputes that any of the three WBD executives are sufficiently highly-placed to warrant protection under the apex doctrine. (Dkt. No. 39 at 1-2). The record is undeveloped on this point. As a resolution of this issue is immaterial to the Court's determination, the Court will assume, without deciding, that the executives' positions do entitle them to claim apex doctrine protection.

2022 meeting with its client regarding the Event; Felder's post-firing request for
WBD to reconsider his firing; and [the] incident when Steinlauf delayed reporting
that an intoxicated Account Executive [] threw a punch at Felder's then-supervisor
and was not punished for his delay." (Dkt. No. 39 at 1 (citing Compl. ¶¶ 24, 74-75,
77, 100, 104-05)).

    Plainly, Steinlauf has personal knowledge of facts relevant to the claims and
defenses in this action. He had a longstanding relationship with Felder and has
uniquely relevant knowledge concerning, at a minimum, the 2009 incident. Not
only has the Court found that incident to be relevant, as noted above, but WBD has
acknowledged that Felder may depose Steinlauf about the 2009 incident. (Dkt. No.
50 at 4 n.11). If Steinlauf is to be deposed about the 2009 incident, he might as well
be deposed about the other relevant events at issue in this case. There is no reason
to think that Felder seeks Steinlauf's deposition for purposes of harassment. WBD
has failed to provide a sufficient basis for application of the apex doctrine to
Steinlauf here. Therefore, Steinlauf must be produced for deposition.

### 2. Kit Herrera

    WBD argues that, like Steinlauf, Herrera did not attend the Event, had no
communications with Felder about his incident report, and was not the decision-
maker for his termination. (Dkt. No. 36 at 2-3). Moreover, WBD contends that
other witnesses it has agreed to produce can testify about the matters of which
Herrera has knowledge, including Greg Regis, who, along with Herrera (and
Steinlauf) attended the meeting with the client following their complaint; Adria

Alpert-Romm, WBD's then-Chief People & Culture Officer, whom WBD has identified as the decision-maker for Felder's termination; and Anna Wingert, Vice President of People & Culture, who, along with Alpert-Romm, will be able to testify to the non-privileged underlying facts that motivated the decision to terminate Felder. (*Id.*). Thus, WBD concludes, "Plaintiff's requested deposition of Ms. Herrera is unnecessarily cumulative and would cause an unjustified business disruption to WBD." (*Id.*).

Felder replies that Herrera has personal knowledge of the Investigation and decision-making process leading to Felder's firing. Herrera, Felder notes, was present at WBD's August 2, 2022 meeting with its client concerning the Event; she met with Wingert on August 3 for an "Incident Discussion"; she met with Wingert and Steinlauf several times between August 10 and 15 about the Event; and, in an email that WBD produced, Herrera discussed arranging for a time with Wingert and Alpert-Romm to "review the plan" about Felder's firing. (Dkt. No. 39 at 2-3) (citations omitted).

Based on the parties' submissions, it appears that Herrera, even if not the ultimate decision-maker, participated substantially in the discussions within WBD's human resources group about the Event and Felder's termination. She clearly possesses relevant personal knowledge. While much of her knowledge may be cumulative to that of other witnesses, at the same time Herrera does not appear to hold a particularly high position within WBD, and it is difficult to see how her deposition would create a disruption to the business. In short, although a closer

call, WBD has again failed to demonstrate that the apex doctrine should apply to Herrera.  WBD's motion for a protective order with respect to Herrera is likewise denied.

### 3. Michele Kornett

Kornett was Felder's direct supervisor.  (Compl. ¶ 29).  In contrast to Steinlauf and Herrera, Felder did communicate with Kornett about the incident at the Event.  (*Id.* ¶¶ 68-69, 73).  Nevertheless, WBD argues that she escalated Felder's report to Regis, and Felder had conversations with Regis afterward.  (Dkt. No. 36 at 3; *see* Compl. ¶¶ 68-69, 73).  In addition, WBD argues, to the extent Felder seeks deposition testimony about Event approval, Regis can be deposed about that subject because Felder alleges Regis was involved in the approval process.  (Dkt. No. 36 at 4; *see* Compl. ¶ 30).  Therefore, WBD contends, Kornett's deposition would be duplicative of Regis' deposition.  (Dkt. No. 36 at 3).

Felder replies, *inter alia*, that, as detailed in the Complaint, Felder made his allegedly "protected complaint" to Kornett; Kornett told Felder she would report his complaint to her supervisor, Regis; Kornett was part of the call with Felder and Regis in which Felder again made a protected complaint about the Event; Kornett told Felder that she did not believe it was appropriate to raise complaints with Human Resources without discussing the issue with a supervisor; and Kornett has knowledge as to whether WBD disciplined others because of the Event and the reasons for those decisions.  (Dkt. No. 39 at 3 (citing Compl. ¶¶ 73, 78, 95)).  Furthermore, in response to Felder's interrogatories, WBD identified Kornett as

among those involved in approving the Event and those with knowledge of Felder's complaints about the Event.  (*Id*.).

The Court finds that Kornett—Felder's direct supervisor—unquestionably has personal and even unique knowledge of relevant facts.  She was directly involved with the Event and with Felder's reporting of the incident at the Event, and Felder claims she told him not to report the incident to Human Resources. Further, it is Kornett's alleged unavailability on the Friday immediately after the Event that Felder points to as the reason why he did not report the incident earlier. (*See* Compl. ¶ 65).  While WBD suggests it is prepared to stipulate that Kornett was out of the office that day (Dkt. No. 36 at 3), Felder is entitled to question Kornett about the relevant circumstances, including, for example, whether she faults Felder for not trying to reach her earlier.  Felder is also entitled to ask Kornett about her conversations with others at WBD about the Event and Felder's conduct, including Regis, whom Felder alleges made inappropriate comments during Felder's own discussions with him about the incident.  (*See* Compl. ¶¶ 70-71).  Moreover, as Felder's direct supervisor, Kornett certainly has personal knowledge about Felder's performance.  WBD has not come close to establishing that Kornett's testimony is protected by the apex doctrine.  Accordingly, WBD's motion for a protective order with respect to Kornett is denied.

## CONCLUSION

For the reasons stated herein, Felder's motion to compel comparator information, documents related to his performance, and ESI searches (Dkt. No. 29)

is **GRANTED IN PART** and **DENIED IN PART**; Felder's motion to compel documents relating to WBD's internal investigation (Dkt. No. 33) is **GRANTED IN PART** and **DENIED IN PART**; and WBD's motion for a protective order barring depositions (Dkt. No. 36) is **DENIED**.  The Clerk of Court is respectfully directed to close the motions pending at Docket Nos. 29, 33 and 36.

As the stay of discovery deadlines previously issued by the Court is now lifted (*see* Dkt. No. 32), the parties shall submit a joint letter by no later than **Friday, June 27, 2025** proposing a plan for the continuation and completion of discovery.

**SO ORDERED.**

DATED:    New York, New York

June 20, 2025

_____
The Honorable Gary Stein
United States Magistrate Judge